## HOOKER v. TOWN OF GREENVILLE.

(Filed June 17, 1902.)

1. CONSTITUTIONAL LAW—*Public Schools—Discrimination Between Races—Taxation—Acts (Private) 1901, Chap. 121—The Constitution, Art. IX, Sec. 2—Acts 1901, Chap. 497.*

   The general assembly may not discriminate in favor, or to the prejudice, of either the white or colored races in the distribution of money for public schools.

2. INJUNCTION—*Findings by Court—Province of Supreme Court.*

   The supreme court may, on an appeal from an order granting or refusing an injunction, review the findings of fact, as well as of law of the trial court.

3. STATUTES—*Enactment—Taxation—Yeas and Nays—Journal—Constitution, Art. II, Sec. 14.*

   An act to levy a tax by a town not for necessary expenses, must be read three several times and passed on three different days, and the names of those voting on the second and third readings entered on the senate and house of representatives journals.

ACTION by S. T. Hooker against the Town of Greenville, heard by Judge *F. D. Winston,* at Fall Term, 1901, of the Superior Court of PITT County. From a judgment for the defendant, the plaintiff appealed.

*Skinner & Whedbee,* for the plaintiff.

*Fleming & Moore,* and *Simmons & Ward,* for the defendant.

FURCHES, C. J. The defendant, the town of Greenville, believing it was authorized by Chapter 121 of the Private Laws of 1901, to raise, by the issue and sale of $75,000 par value of coupon bonds, money for the purposes stated in said act, proceeded to hold an election as provided in said chapter; and after said election, at which it was found and declared

that a majority of the qualified voters of said town had voted for the issue of said bonds, the defendant proceeded to advertise and was offering said bonds for sale. And it alleges in its answer that it had agreed upon a sale of the same, and had levied a tax for the purpose of paying the accruing interest thereon; and the defendant being of the opinion that Chapter 497, of the Public Laws of 1901, had established a graded school within the corporate limits of the town of Greenville, had levied a tax of ten cents on the $100 worth of property, and thirty cents on the taxable polls for the support of said graded school.

But the plaintiff, a citizen and taxpayer of the town of Greenville, believed that said act providing for the issue of bonds was void for irregularity in its submission to the voters for their approval, and alleged that the act for the purpose of establishing the graded school was void for the reason that it discriminated in the distribution of the money collected by taxation between the white and colored races. And he further contends that they are both invalid for the reason that they were not passed by recording the yeas and nays on the second and third readings, as the Constitution requires such laws for raising money and taxing the people and their property should be, and are void on that account.

This action is brought to restrain and perpetually enjoin the defendant from issuing and selling said bonds, and from levying any tax for the payment thereof, or the interest thereon; and to enjoin the defendant from paying the $5,000 provided therein to the trustees of the graded school, and from levying and collecting any tax for the support and maintenance of said graded school. Upon a hearing before *Winston*, J., the injunction was refused and the plaintiff appealed.

There were many affidavits and orders offered on the hearing, as to the alleged irregularities in the manner of the registration and holding the election, and as to the manner in

which the defendant performed its duty, and as to the best place to get a water supply. But we will not enter upon a discussion of these, further than to say that where the defendant has the *power to act,* the Courts will not interfere unless fraud or bad faith is alleged and shown, but will leave these matters to be corrected by the people at the next election, if there is cause of complaint.

But the next ground alleged is a matter of which we must take notice, to-wit, that the act establishing the graded school discriminates in its provisions against one race and in favor of the other. If this is so, it is in violation of Article IX, Section 2, of the Constitution, which provides as follows: "And the children of the white race and the children of the colored race shall be taught in separate public schools; but there shall be no discrimination in favor of or to the prejudice of either race." That is, one white child of the school age shall have the same amount of money *per capita* as a colored child, and no more; and the colored child shall have the same amount *per capita* as any white child, and no more; that both races shall have equal opportunities for an education, so far as the public money is concerned. If this bill discriminates against *either race* to the prejudice of the other race, it is unconstitutional. *Riggsbee v. Durham,* 94 N. C., 800; *Puitt v. Commissioners,* 94 N. C., 709. And the law will not allow that to be done by indirection that can not be done directly. The act establishing this graded school (Chapter 479, Public Laws 1901) has fifty calls, that is, fifty corners and fifty lines, in its boundary, which seem to us to be remarkable, and we were not able to understand what are the boundaries from the calls in the act. Therefore, for the purpose of explaining the calls in the act, we had a map of the town of Greenville, including the school district, furnished us for the purpose of enabling us to understand the calls in the act. *Blue v. Ritter,* 118 N. C., 580; *Foster v. Hackett,* 112 N. C., 546. The boundaries are as follows:

MAP OF GREENVILLE, N.C.

Explanation.

Town Boundaries
Boundaries of School District
Colored Residents of District
White Residents out of District
Property of Whites Residing out of District
Property of Negroes Residing out of District

"SECTION 1. That all the territory embraced within the following limits in the town of Greenville, Pitt County, to-wit, beginning on Tar River at the river bridge, foot of Pitt street, thence up said river to the first branch, commonly called Skinner's Ravine, thence with said ravine or branch to the eastern boundary line of the W. and W. Railroad where it crosses said branch, thence with said eastern boundary of right-of-way of said railroad to Tar River, thence up Tar River to the present corporate limits of said town, thence with said corporate limits of said town to the river road, at a point where Fifth street extended would cross said line, thence with said river road for Fifth street to J. L. Sugg's northwest corner on said street, thence his line so as to include his lot to the western line of the right-of-way of the W. and W. Railroad, thence across said railroad to John Flanagan's southwestern corner on said right-of-way, thence his back line and N. H. Bagwell's, Miss Martha O'Hagan's, and Dr. C. O. H. Laughinghouse's back line to Pitt street, thence across Pitt street an air-line to S. T. Hooker's back line, thence his line to Miss McKenny Perkins' and J. A. Andrews' back lines to C. D. Rountree's corner on his back line, thence C. D. Rountree's line to Greene street, thence down Greene street to the Methodist parsonage's southern corner on said street, thence with said parsonage line to R. N. King's line, thence his line to Frank Tyson's, thence with B. F. Tyson's back line, including said Tyson's lot, to Dickeson avenue, thence with northern side of Dickeson avenue to R. A. Tyson's first corner on said street, thence his back line, including said lot, to Greene street, thence across Greene street to C. D. Rountree's northeast corner, thence his line so as to include his lot and R. A. Tyson's line to Pitt street, thence up said Pitt street to B. C. Shepperd's northeast corner, thence his line to a point one-half distance between Pitt and Clark streets, thence from this point a line parallel with Pitt

street an air-line to Zeno Moore's line, thence his line to Clark street, thence with Clark street to Dickeson avenue, thence with Dickeson avenue in a westerly direction to the first ditch crossing said street, thence up said ditch to the W. and W. Railroad trestle over said ditch, thence an air-line from said trestle to the northeast corner of old college lot, thence with old college line in a westerly direction and southerly direction, including said college lot, to old plank road, thence along and across in a southwesterly direction old plank road to E. A. Moye's northeast corner, thence his line to a point 60 feet north of Broad street, thence a line parallel with Broad street and 60 feet north of said street to the western boundary of the right-of-way of the W. and W. Railroad, thence along said right-of-way to a point where Eleventh street extended would cross said railroad, thence with the line of Eleventh street to a point where an air-line drawn from the eastern side of Liberty Warehouse would cross said street, thence a line made by extension of eastern side of Liberty Warehouse to Ninth street, thence Ninth street 200 feet in an easterly direction, thence a line parallel with the eastern side of Liberty Warehouse to Twelfth street, thence with Twelfth street to the road leading from Greenville to Green's Mill-Run, thence with said road in a northerly direction to Alfred Forbes' northeast corner of the lot on which he now lives, thence his line to the livery stable lot of G. M. Tucker and Rickey Moore, thence this eastern line to Fifth street, thence with Fifth street in an easterly direction to a point midway between Cotanch and Read streets, thence a line from this point parallel with Cotanch street to Second street, thence with Second street to Evans street, thence with Evans street to a point midway between First and Second streets, thence a line midway between First and Second streets to eastern line of Washington street, thence with Washington street to a point midway between

Second and Third streets, thence this line parallel with Third street 165 feet, thence an air-line parallel with Washington street to Second street, thence with Second street to Washington street, thence with Washington street to a point midway between First and Second streets, thence an air-line parallel with Second street to Pitt street, thence with Pitt street to the beginning."

The territory inside the red lines is the school district, and that part of the territory outside the red boundary is excluded from the benefit of this school.

There is another provision in the act that seems to be explanatory of the gerrymandering of the territory of the town for the purposes of this school. The eighth section provides "that if there shall be so few of *either race* in the district that the Board of Trustees shall deem it inadvisable to organize a school for that race, then they shall have power to arrange for the children of the race which shall be represented to receive their *pro rata* proportion of the fund so raised by the special tax herein provided for, in some other manner, or they may give such *pro rata* proportion to the public schools for that race adjoining the district herein described."

The Constitution says both races shall fare equally in matters of public schools, though they shall be taught in separate schools. If there "shall be so few of *either race,* the *pro rata* of that race may be given to an adjoining school district." Without ascribing any reason the draftsman may have had for using the term "either race," we will suppose it was the *white race* he thought would be so small that it would not be worth while to organize a school for them, and if not, to give their money to some adjoining *white* district; would this be fair treatment to the *white* children in the district, and would it be treating them equally with the colored race? Would it not be a discrimination against them? But if we are in error in supposing that it was the *white race* that this section

had reference to, and it was the *colored race,* the rule would be the same. We do not think that the act could authorize giving the money of "either race" to some other district. The Constitution has given it to them, and the Legislature can not take it away from them and give it to someone else. Therefore, as we are only considering this appeal on a motion for injunction to the hearing, as there are many disputed facts which we will not undertake to decide, we will only say that it appears to us now that this act is unconstitutional. But, if it should be made to appear on the trial that this map is not correct, and the territory bounding the school district is not as therein represented; or that there are no negroes in said district to be discriminated against, or that there are no white children in said district to be discriminated against, and that neither race was so small but what a school should be *organized* and taught for the term free schools are to kept open; then it may not be unconstitutional on account of its discriminations. This being an application for an injunction, this Court has the right to review the findings of fact by the Court below, as well as the law. *Jones v. Boyd,* 80 N. C., 258.

But upon examining the supplemental statement of case on appeal, certified by the Secretary of State, we find that neither of these acts were passed as they were required to be passed by the Constitution, to authorize the defendant to create any debt by issuing bonds, or to raise money by taxation. They both seem to have been properly passed in the Senate—the yeas and nays having been called and recorded on the second and third readings, and on different days; but this was not done in the House, and of course, this being so, if it is so, and it appears to us that the yeas and nays were not recorded in the House on either the second or third reading, and this appearing to us to be so, both acts are unconstitutional for the purposes for which they were intended.

*Commissioners v. DeRossett,* 129 N. C., 275; *Black v. Com-missioners,* 129 N. C., 121.    There was error in refusing the injunction.

Error.