BENEHAN CAMERON ET AL. v. STATE HIGHWAY COMMISSION ET AL.

(Filed 21 June, 1924.)

1. **State Highways—Roads and Highways—Appeal and Error—Review of Findings.**

   The findings of fact, as well as the conclusions of law, are reviewable by the Supreme Court, on appeal, in passing upon the judgment of the Superior Court judge in a suit involving the validity of the order of the State Highway Commission in determining a proper route for the State Highway between two county seats, etc.; and exception that the facts were not sufficiently found is untenable.

2. **State Highways—Roads and Highways—Commission—Discretionary and Restricted Powers—Statutes.**

   Construing the Public Laws of 1921, ch. 2, creating a State Highway Commission to take over for the State, as therein provided, the highways or public roads, change, alter or construct them so as to form a State-wide system, connected with such systems of other states: *Held,* section 10, giving the commission broad and comprehensive discretionary powers in the adoption of routes, should be construed *in pari materia* with section 7 thereof, the latter limiting the discretion conferred in the former, among other things, in respect to routes between county-seats, "principal towns," according to a map referred to and attached to the act; and as to those matters particularly mentioned in section 7, the discretion was taken away from the commission by express statutory provision.

3. **Same—Routes of Highways—Principal Towns—Courts—Questions of Law and Fact.**

   *Held,* the map referred to in the act as a "proposed" route of the State Highway system, by placing certain towns along its proposed route, does not affect the discretionary authority of the Highway Commission in locating the highway between county-seats, or prevent the commission

from changing the route from them, but its determination is reviewable by the courts as a mixed question of law and fact, whether the change decided upon goes by the principal towns as required by the statute.

**4. Same—Absence of Discretion—Evidence.**

*Held*, in this case there was no evidence of abuse of discretion by the State Highway Commission in changing the route of the State Highway between two county-seats and leaving out a certain small town appearing on the map and shown as on the "proposed" route.

**5. Same—Constitutional Law—Due Process.**

Those who have acquired property along the "proposed" route, as shown in connection with the consideration by the Legislature of the bill which became enacted into the Public Laws of 1921, ch. 2, establishing under the State Highway Commission a method for building a State system of highways, acted with implied notice of the powers conferred upon the commission in changing the route, and cannot maintain the position that they have been deprived of the due-process-of-law provision in the Constitution, whether of a vested right or otherwise.

STACY, J., concurring; CLARKSON, J., concurring, in part.

APPEAL by plaintiffs from a judgment of *Sinclair, J.,* vacating a restraining order.

*A. W. Graham & Son, F. W. Hancock, R. O. Everett, and Brawley & Gantt for plaintiffs.*
*Attorney-General Manning, Assistant Attorney-General Nash, W. L. Cohoon, John W. Hester, L. P. McLendon, and W. W. Sledge for defendants.*

ADAMS, J. The chief purpose of this action is to enjoin the defendants from building a highway between Durham and Oxford via Creedmoor. Between these *termini* there is a public road which passes through the town of Stem, and is now, and for about three years has been, under the control of the State Highway Commission. The former is referred to in the record as the Creedmoor route, and the latter as the Stem route. In 1923 the plaintiffs and others filed with the commissioner of the Fourth District a petition that the Stem route be laid with a hard surface, and in pursuance of such request the commissioners caused both routes to be surveyed. The engineers made reports, and the commissioner finally recommended that the defendants adopt the Creedmoor route as the permanent highway between the two county-seats. After due consideration, the defendants concluded that the Creedmoor route was the "practicable and feasible location," and ordered that it be adopted as the permanent line of the highway, and that maintenance of the Stem route be continued pending the construction of the new road. The plaintiffs subsequently obtained a temporary order restraining the

construction of the Creedmoor route, and the motion to continue it until
the final hearing was considered by Judge Sinclair upon complaints
filed respectively by the original plaintiffs and by the town of Stem,
which was made a party after the action had been brought, the answer
of the defendant, the record evidence and several affidavits. After argu-
ment, his Honor rendered a formal judgment, vacating the temporary
order, and the plaintiffs excepted and appealed, assigning as error the
judgment given and his Honor's failure to find the facts upon which the
judgment was based.

The second assignment is not sufficient ground for reversal. In the
first place, his Honor found such facts as he deemed essential, and
embodied them in the judgment. Moreover, in a suit of this nature the
appellate court may review the evidence and determine questions of fact
as well as of law. *Jones v. Boyd,* 80 N. C., 258; *Mayo v. Comrs.,* 122
N. C., 5; *Hooker v. Greenville,* 130 N. C., 472; *Hyatt v. DeHart,* 140
N. C., 270; *Lee v. Waynesville,* 184 N. C., 565; *School Committee v.
Board of Education,* 186 N. C., 643.

The outstanding question is whether there is reversible error in the
judgment. The plaintiffs contend that the State Highway Commission
is an administrative body, clothed only with such discretionary powers
as are essential to the performance of its prescribed duties; that it may
change, alter, or discontinue parts of roads to avoid grade crossings and
curves, to lessen distance, and generally to take advantage of topo-
graphical conditions, but that it is not authorized to abandon a desig-
nated road connecting county-seats and build another elsewhere between
the same *termini.* They insist that the map referred to in the act by
which the commission was created contains an outline of the particular
roads which the Legislature designated and approved, and that a ma-
terial departure therefrom would constitute a breach of the spirit and
purpose of the law.

In view of these contentions, it becomes necessary to examine both the
map and the act to which it is appended. The act was passed in 1921.
Public Laws 1921, ch. 2. Its purposes were defined. The State was to
lay out, take over, establish, construct, and assume control of certain
highways, to make a hard surface for them as rapidly as possible, and
to maintain the entire system, the maximum mileage of which was to
be approximately fifty-five hundred miles. Sections 2, 3, 4. In section
7 appear also the following provisions: "The designation of all roads
comprising the State Highway system, as proposed by the State High-
way Commission, shall be mapped, and there shall be publicly posted
at the courthouse door in every county in the State a map of all the
roads in such county in the State system; and the board of county com-
missioners or county road-governing body of each county, or street-

governing body of each city or town in the State, shall be notified of the routes that are to be selected and made a part of the State system of highways; and if no objection or protest is made by the board of county commissioners or the county road-governing body of any county, or street-governing body of any city or town in the State, within sixty days after the notification before mentioned, then and in that case the said roads or streets to which no objections are made shall be and constitute links or parts of the State highway system. If any objections are made by the board of county commissioners or county road-governing body of any county, or street-governing body of any city or town, the whole matter shall be heard and determined by the State Highway Commission in session, under such rules and regulations as may be laid down by the State Highway Commission, notice of the time and place of hearing to be given by the State Highway Commission at the courthouse door in the county and in some newspaper published in the county at least ten days prior to the hearing, and the decision of the State Highway Commission shall be final. A map showing the proposed roads to constitute the State Highway system is hereto attached to this bill and made a part hereof. The roads so shown can be changed, altered, added to, or discontinued by the State Highway Commission: *Provided,* no roads shall be changed, altered or discontinued so as to disconnect county-seats, principal towns, State or National parks or forest reserves, principal State institutions, and highway systems of other states."

By section 10 the commission is vested with certain powers, among which are these: "To take over and assume exclusive control, for the benefit of the State, of any existing county or township roads, and to locate and acquire rights of way for any new roads that may be necessary for a State highway system, with full power to widen, relocate, change, or alter the grade or location thereof; to change or relocate any existing roads that the State Highway Commission may now own or may acquire."

We think it will appear, from a careful reading of these sections, that the roads outlined on the map were intended as a tentative and not as a completed or final system of highways. *Road Commissioners v. Highway Commission,* 185 N. C., 56. They were referred to in the act as comprising a system "proposed" by the commission, and again as roads "proposed" for the State Highway system. They were not intended to be unalterable. In section 7 the commission was given express power, subject to limitations, to change, alter, add to, and discontinue roads; and, apparently, with a view to removing all doubt as to the scope of this power in relation to the question under consideration, it was vested with the specific right "to change or relocate any existing roads that it

may now own or may acquire." These definite and significant provisions convince us that the map cannot reasonably be accepted as a legislative fiat to construct a system of highways in strict conformity with the roads "proposed," and that the roads may be changed, altered, relocated, and discontinued in the sound discretion of the commission, subject to the limitations prescribed by law.

What are these limitations? The defendants contend that constructing, changing, relocating, and discontinuing highways are matters peculiarly within their discretion and are not subject to judicial review, except in case of abuse. In *Road Commission v. Highway Commission, supra,* it was said that the Highway Commission is an administrative body; and, as suggested in the defendant's brief, it has been held, in an unbroken line of decisions extending over more than half a century, that the courts may not control the discretion exercised · by a local administrative board unless its action is so clearly unreasonable as to amount to oppressive and manifest abuse. We adhere to this doctrine. We accede to the answer implied in the question, "Who made us judges over such matters?" *Supervisors v. Comrs.,* 169 N. C., 548. We do not controvert the proposition that the defendants are clothed with certain discretionary powers; but, as we interpret the act, these powers do not include changing, altering, or discontinuing all roads in the exercise of a discretion which can be reviewed only in case of oppression or bad faith. We think the changing, the alteration, or the discontinuance by the defendants of the roads defined in the proviso of section 7 is subject to judicial review, without regard to the question of an abuse of discretion. The terms of the proviso are positive and mandatory, and not uncertain or discretionary. Section 7 provides that the roads shown on the map may be changed, altered, added to, or discontinued by the commission. Nothing else appearing, this clause would probably be construed as conferring powers to be exercised in the discretion of the defendants; but immediately following are the words: *"Provided,* no roads shall be changed, altered, or discontinued so as to disconnect county-seats, principal towns, State or National parks or forest reserves, principal State institutions, and highway systems of other states."

One of the functions of a proviso is to qualify or restrain some preceding matter, or to exclude some possible ground of misinterpretation of it as extending to cases which the Legislature did not intend to bring within its purview. 25 R. C. L., 984, sec. 231; Potter's Dwarris on Statutes, 118 *et seq.; Supply Co. v. Eastern Star Home,* 163 N. C., 513. As we understand it, the very purpose of this proviso was to exclude the construction that, as to the roads therein described, the defendants should have the discretionary power upon which they now insist. In the exercise of a legal discretion they may determine whether a road

shall be changed, altered or discontinued if they observe the mandate of the proviso. But this mandate must be observed; and if it be granted that county-seats, State parks, National parks, and forest reserves may be identified *ex vi termini,* it is not so with respect to "principal towns" or "principal State institutions." As there is no recognized technical definition of "principal towns," we are of opinion that the Legislature used these words in a broad sense, to be determined by the conditions relatively appearing in each particular case, and in this sense they are the subject of judicial determination. This construction is essential to uniformity of decision, which would be defeated if the question were left entirely to the discretionary judgment of the commission. To hold with the defendants that the right to determine what are principal towns is to be referred to the commission itself, and that their action is final, except in case of manifest abuse, would be the proper interpretation of the act if there had been no proviso. It is clear, therefore, that the Legislature was not willing to confer such extended powers on the commission, but inserted the proviso with the view and purpose of making the decision as to what are principal towns within the meaning of the act a mixed question of law and fact, subject to judicial review as it ordinarily prevails in such cases. A contrary ruling would be to deprive the proviso, evidently intended as an important feature of the law, of any and all significance. Of course, section 7 and section 10, being *in pari materia,* must be construed together.

Our conclusion is not at variance with the decision in *Peters v. Highway Commission,* 184 N. C., 30, or *Road Commission v. Highway Commission, supra.* The former concerned a local act, and in the latter the construction of the proviso in section 7 was neither presented nor discussed.

The plaintiffs contend that the name of Stem appears on the map, indicating the route which they advocate, and that Stem is therefore a "principal town." We have disapproved this construction and have concluded, after a critical examination of the record, that Stem is not a principal town, within the meaning of the act.

It is further insisted on behalf of the plaintiffs that if Stem is not a principal town, and if the defendants exercised discretionary power which was not in conflict with the proviso, they acted oppressively or in bad faith. We do not concur. The defendants came to their conclusion after a patient hearing and a personal inspection of the proposed routes, and were impelled, as they declared, by their judgment as to "the best interest of the State."

The plaintiffs finally contend that land has been bought and homes have been built along the Stem route, and that while no vested rights have accrued, the adoption of the Creedmoor route was the determina-

tion of a public matter, which was void, in the absence of due process of law. No authority for the position is cited. Indeed, the plaintiffs have been given every reasonable opportunity to be heard in the courts, and their position and briefs have been duly considered. Those who have built homes or purchased property on the Stem route since the act of 1921 became effective have done so with constructive notice of the powers conferred upon the highway commission.

While we do not concur in his Honor's intimation that the powers conferred upon the defendants are altogether discretionary, we approve the result and affirm the judgment.

Affirmed.

STACY, J., concurring: Road-building is not a matter of drawing lines upon a map; it partakes of scientific, rather than legislative or judicial, engineering. The topography of the county must be considered. Knowing that the system of "proposed roads"—note the language—designated on the map attached to the act of 1921, must necessarily be tentative, and realizing that economy in building a network of State highways, as well as intelligent construction of said roads, would require expert engineering and scientific location, the Legislature created a State Highway Commission and wisely conferred upon it the authority to "change, alter, add to, or discontinue" any of the proposed roads so shown upon the legislative map, subject only to the following limitation: "*Provided*, no roads shall be changed, altered or discontinued so as to disconnect county-seats, principal towns, State or National parks or forest reserves, principal State institutions and highway systems of other states."

Upon the proper construction of this proviso the whole case pivots.

It will be observed that the phrase, "as shown on said map," is not inserted after the words, "principal towns," appearing in said proviso. These words, "principal towns," also appear in the caption and in section 3 of the act. Plaintiffs contend that as all the county-seats of the 100 counties in the State are shown upon the map, it follows as the legislative intent that the principal towns which may not be disconnected are those, and only those, which have been named on the map attached to the act of 1921. This, to my mind, is not only a *non sequitur*, but it imputes to the Legislature a purpose to limit the discretionary powers of the State Highway Commission, given in sections 7 and 10, in a manner wholly at variance with sound principles of engineering and economic construction of highways. Under this interpretation, the authority of the State Highway Commission to change, alter, add to, or discontinue any of the proposed roads shown upon the map is limited to the authority to change, alter, and add to the roads between the

towns designated on said map, and the word "discontinue," for all practical purposes, must be considered as stricken from the act or else confined to portions of roads lying between the principal towns as designated on the map; and if any road lying between any of said principal towns is discontinued, another must be established in its stead. In other words, under this construction, every town designated on said map is a principal town and must be connected, in some way, with the State's system of highways. But unless a given town appear by name on said map, though it be much larger than others shown thereon, the State Highway Commission would be under no obligation to connect it with the State's system of highways. The impolicy of result arising from such a construction is self-evident.

To my mind, the "principal towns," mentioned in the statute and which may not be disconnected from the State's system of highways, are to be determined by the State Highway Commission in the exercise of a sound, but not arbitrary, judgment. This position is strengthened by reference to the caption of the act, which is as follows: "An act to provide for the construction and maintenance of a State system of hard-surfaced and other dependable roads, connecting by the most practicable routes the various county-seats and other principal towns of every county in the State, for the development of agriculture, commercial and industrial interests of the State, and to secure benefits of Federal aid therefor, and for other purposes."

Where the meaning of a statute is doubtful, its title may be called in aid of construction. *Freight Discrimination Cases,* 95 N. C., 434; *S. v. Woolard,* 119 N. C., 779; *S. v. Patterson,* 134 N. C., 612.

The case before us presents a striking illustration of why this interpretation should be adopted. In locating the road between Durham and Oxford—two county-seats—the State Highway Commission was confronted with the question as to whether it should adopt the northern route, running by Stem, or the southern route, running by Creedmoor. The mileage of the two routes is practically the same; and Creedmoor is a larger town than Stem. The commission might have selected either route without doing violence to the provisions of the statute now under consideration. But to say that the northern route must be selected because Stem appears on the map and Creedmoor does not is to ignore every consideration of wisdom and expediency in determining the proper location. If this be the correct interpretation of the statute, then the location of all the roads in the State has been settled in advance by legislative fiat.

In a number of instances the towns appearing on the map have been disregarded as controlling by the State Highway Commission. The commission, on the other hand, has sought to connect the various county-

seats and other principal towns of every county in the State with hard-surfaced or other dependable roads "by the most practicable routes," in accordance with the purpose and spirit of the act as expressed in its title and otherwise.

If the meaning of a statute be plain and its provisions susceptible of but one interpretation, its consequences, if objectionable, can only be avoided by a change in the law itself. But where the purpose of the Legislature is not clearly expressed, it is always to be presumed that a statute was intended to have the most reasonable and beneficial operation permissible from the language used. And when a statute is ambiguous in terms or fairly susceptible of two interpretations, the injustice, hardship, or inconvenience which is likely to follow the one construction, or the other, may be considered, and a construction of which the statute is fairly susceptible may be placed upon it, so as to avoid all such objectionable consequences and advance what must be presumed to be its true object and purpose. 25 R. C. L., 1018. In short, it is well settled that if the language of a statute be obscure or ambiguous and its meaning not clearly designated, the effects and consequences of the one construction or the other may and ought to be resorted to as important aids in determining its true meaning and intent. 2 Lewis' Suth. Statutory Construction (2 ed.), secs. 488-490.

Again, in ascertaining the meaning of a doubtful statute, the courts may resort to what is sometimes called the practical construction given to it by those charged with its execution and application; and such construction, while not controlling, is entitled to respectful consideration. 25 R. C. L., 1043. Here the State Highway Commission and the Attorney-General have interpreted the act in question at variance with the construction contended for and urged by counsel on behalf of plaintiffs.

There is still another rule, with respect to the interpretation of provisos, which should not be overlooked; it is not unimportant in dealing with the subject of statutory construction. A proviso which operates to limit the application of the general provisions of a statute should be construed strictly so as to include no case not within the letter of the proviso. *U. S. v. Dickson,* 15 Pet., 141, 10 L. Ed., 689. And since the office of a proviso is not to repeal the main provisions of a preceding clause (to which, as a general rule, it is deemed to apply), but to limit their application, no proviso should be construed so as to destroy such general provisions. *Greely v. Thompson,* 10 How., 225, 13 L. Ed., 397. Effect should be given to all parts of a statute when this can be done in accordance with recognized rules of construction and without doing violence to the spirit of the act. Black on Interpretation of Statutes, pp. 35-36.

"The true rule for construing a statute, and we may say the only honest rule, for a court really seeking to observe the will of the Legislature, is to consider and give effect to the natural import of the words used. If they be explicit, and express a clear, definite meaning, then that meaning is the one which should be adopted, and no effort should be made by going outside of the words used, to limit or enlarge its operation. Above all, it is not to be presumed that the Legislature intended any part of a statute to be inoperative and mere surplusage," etc. *Ruffin, J.,* in *Pugh v. Grant,* 86 N. C., p. 47.

And to like effect is the language of *Walker, J.,* in *Comrs. v. Henderson,* 163 N. C., p. 119: "Where the language of a statute is free from ambiguity and conveys a definite and sensible meaning, the courts should not hesitate to give it a literal interpretation merely because they may question the wisdom or expediency of the enactment. In such a case, these are not pertinent inquiries for the judicial tribunal. If there be any unwisdom or injustice in the law, it is for the Legislature to remedy it. For the courts, the only rule is *ita lex scripta est.* If, though, the statute is ambiguous, so as to be fairly susceptible of more than one interpretation, then the courts may rightfully exercise the power of construing its language, so as to give effect to the intention of the Legislature as the same shall be ascertained and determined from relevant and admissible considerations. But it should be understood that the intention of the lawmaking power is to be ascertained by a reasonable construction of the act, and not one founded on mere arbitrary conjecture. And it is always the actual meaning of the Legislature which must be sought out and followed, and not the judge's own idea as to what the law should be. Finally, although every law must be construed according to the intention of the makers, as evidenced by the language employed to express it, that intention is never resorted to for any other purpose than to ascertain what, in fact, was meant to be done, and not for the purpose of ascertaining what they have done, with the view of determining whether it is politic or expedient, for with that we have nothing to do. We have reached the limit of our jurisdiction when we have certainly found and declared the meaning, as the object is to ascertain what the Legislature intended to enact, and not what is the legal consequence and effect of what they did enact."

Bearing in mind these general observations and applying the principles stated to the circumstances of the instant case, I am convinced that the judgment of the Superior Court, upholding the action of the State Highway Commission in selecting and adopting the Creedmoor route, should be affirmed. The question presented is one addressed, in the first instance, to the sound discretion of the State Highway Commission.

There is no evidence that this has been abused or exercised in an arbitrary and unreasonable manner. *School Com. v. Board of Ed.,* 186 N. C., 643; *Brodnax v. Groom,* 64 N. C., 244.

It is contended by Stem and Creedmoor respectively that each is a principal town, between Durham and Oxford, which, under the statute, may not be disconnected from the State's system of highways. Here, then, we have a controversy over the principality of two towns. Who is to decide the question? It must be decided by somebody before the road from Durham to Oxford can be built, or before it can be finally located. In my opinion, it must be determined by the State Highway Commission in the exercise of a sound discretion, subject to judicial review only in case of abuse of discretion or when the authority reposed in the commission has been exercised in an arbitrary and unreasonable manner. This, it seems to me, is in keeping with the legislative intent as expressed in the statute. The fact that Stem is shown on the map attached to the act of 1921, and Creedmoor is not, is an immaterial circumstance, which is neither controlling nor persuasive. It is the declared purpose of the law that the various county-seats and other principal towns should be connected "by the most practical routes," such practical routes to be determined and established by the State Highway Commission.

I recognize the curbing effect of the above proviso upon the plenary discretion of the State Highway Commission; and to the extent indicated therein, it must be understood as limited by the legislative declaration, but in the first instance the matter is primarily one for decision by the State Highway Commission. The determination of such matters is a part of the duties and responsibilities imposed upon it by the statute under which it was created. The commission may not establish and build roads without connecting the county-seats and principal towns of the State. To do otherwise, or to build roads without making such connections, would be an arbitrary and unreasonable exercise of its powers. Nothing of this sort appears on the present record.

·The decision in *Road Com. v. Highway Com.,* 185 N. C., 56, accords with this position and is practically controlling on the question here presented. See, also, *Peters v. Highway Com.,* 184 N. C., 30.

CLARKSON, J., concurring, in part: I concur in so much of the opinion of *Mr. Justice Adams* as is germain to the main controversy here, in which he says: "It is clear, therefore, that the Legislature was not willing to confer such extended powers on the commission."

The plaintiffs, on behalf of themselves and other citizens and property owners of Durham and Granville counties, bring this action praying an injunction against the State Highway Commission from aban-

doning what is known as the "Stem Route" between the county-seats of Durham and Granville counties, the road regularly taken over by the State Highway Commission and used for several years as part of the State system and kept up by the State, and making an entirely new route, known as the "Creedmoor Route," between the two county-seats, and making the new road almost parallel to the old, some 3 to 10 miles distance apart from the old Stem Route and going by Creedmoor. Each route is about 29 miles and the hard-surfacing will cost about the same for each. This is an important matter, as the cost of hard-surfacing either road will be about $1,000,000. The only question involved is, Has the State Highway Commission the power and authority in its legal discretion to make this change? We must interpret the State Highway Road Act for the answer. In the interpretation, to get the intent of the Legislature—the polar star—we are permitted to examine the written documents that the Legislature had before it on the passage of the State Highway Act—not as binding, but persuasive. Especially is this so if the meaning of any word or phrase is ambiguous, as is contended in the case at bar—*principal towns.*

*Mr. Justice Sanford,* of the Supreme Court of the U. S., in *Everard v. Day* (opinion delivered 9 June, 1924), advance sheets, in construing whether an act of Congress was arbitrary and unreasonable, considered the public hearings before the Judiciary Committee of the House and the report of the committee founded on the hearings, as bearing on the act which the Court was called upon to construe. By analogy, to construe the present State Highway Act, it is legal and proper to consider what the Legislature had before them when they passed the present State Highway Act.

They had a bill entitled as follows:

"North Carolina Good Roads Association—Suggested Bill: To provide for the construction and maintenance of a State system of hard-surfaced and other dependable highways, together with map, outlining suggested construction districts for an equitable distribution of construction funds."

By a careful reading of this "suggested bill" and the State Highway Act, Laws 1921, ch. 2, the two bills are practically similar, with a few changes. The map in each bill is the same, except for some additional roads and the towns they went through added to the map in the act as passed. Each bill has the same towns named on the map and the additional towns added through which the roads to be taken over by the State were to run—from county-seat to county-seat. Each map had "Stem" and the road from the county-seat of Durham to the county-seat of Oxford to run through Stem.

Part of section 7 of the act of 1921, ch. 2, is as follows:

"Fifty-five hundred (5,500) miles shall be the approximate maximum limit of mileage of the State Highway System. The designation of all roads comprising the State Highway System as proposed by the State Highway Commission shall be mapped, and there shall be publicly posted at the courthouse door in every county in the State a map of all the roads in such county in the State system, and the board of county commissioners or county road-governing body of each county, or street-governing body of each city or town in the State, shall be notified of the routes that are to be selected and made a part of the State system of highways; and if no objection or protest is made by the board of county commissioners or the county road-governing body of any county, or street-governing body of any city or town in the State within sixty days after the notification before mentioned, then and in that case the said roads or streets, to which no objections are made, shall be and constitute links or parts of the State Highway System. If any objections are made by the board of county commissioners or county road-governing body, or any county or street-governing body of any city or town, the whole matter shall be heard and determined by the State Highway Commission in session, under such rules and regulations as may be laid down by the State Highway Commission, notice of the time and place of hearing to be given by the State Highway Commission at the courthouse door in the county, and in some newspaper published in the county, at least ten days prior to the hearing, and the decision of the State Highway Commission shall be final. *A map showing the proposed roads to constitute the State Highway System is hereto attached to this bill and made a part hereof. The roads so shown can be changed, altered, added to or discontinued by the State Highway Commission.*" Thus far both sections of the act as passed and the "suggested bill" were similar and the above in italics is the exact language in both bills.

The "suggested bill" gave the State Highway Commission discretion, and the courts could not interfere with the discretionary powers conferred unless their action is so clearly unreasonable as to amount to an oppressive and manifest abuse of the discretion conferred. *Newton v. School Committee,* 158 N. C., 186; *School Committee v. Board of Education,* 186 N. C., 647, and numerous cases cited.

But the Legislature would not accept this "suggested bill," giving this discretionary power, but added in the bill as passed, in section 7, *supra,* this proviso: *"Provided, no roads shall be changed, altered, or discontinued so as to disconnect county-seats, principal towns, State or National parks or forest reserves, principal State institutions, and highway systems of other States."*

The Legislature would take no chances. They had the map in the "suggested bill" before them, and on it were marked the towns through which the roads were shown to run—from county-seat to county-seat. They added to the map more roads and put down the towns through which the roads were to run. They used the words "principal towns." The legislators saw on the map these towns marked. Why put them on the map if they were not *principal towns?* They were responsible to their constituents for what they did, and they deliberately said in the proviso that *no roads shall be changed, altered or discontinued so as to disconnect principal towns.* What is the meaning of disconnect? Webster defines it as follows: "To dissolve the union or connection of; to disunite; to sever; to separate; to disperse."

If the towns marked on the map were not *principal towns* and the towns the Legislature had in mind, what would there be to disconnect, "to dissolve the union or connection of"; "to disunite"; "to sever," etc? If the construction here given was not the intention of the Legislature, the word *disconnect* is meaningless in the act. The word not only applies to the towns on the map, but to the State or National parks, or forest reserves, principal State institutions and highway systems of other States. Creedmoor was never connected on the system to disconnect, Stem was, and it cannot be discontinued without making a word, the meaning of which is well known in the English language, senseless.

Section 10 (b) of the State Highway Act, *supra,* does not in any way change the construction and meaning put on *principal towns* as being the towns marked on the map, and the Legislature so understood. That section is as follows:

"To take over and assume exclusive control for the benefit of the State of any existing county or township roads, and to locate and acquire rights of way for any new roads that may be necessary for a State highway system, with full power to widen, relocate, change or alter the grade or location thereof; to change or relocate any existing roads that the State Highway Commission may now own or may acquire," etc.

This section, construed with the proviso, *supra,* clearly means to change and relocate between the *principal towns* on the map. This means to change grades, to make shorter routes between the principal towns on the map, to avoid railroad crossings, to go under railroads, etc., so as to cheapen construction along the fixed route as mapped between the county-seats, but the State road must go through, or near to, the *principal towns* on the map.

The construction of that part of chapter 2 of the Laws of 1921, relative to this controversy, has only been before the Court in the case

7—188

of *Road Commission of Edgecombe Co. v. State Highway Commission,*
185 N. C., 56, but the facts are so dissimilar that the decision in that
case cannot be considered as authority in the instant case.  There the
effort was made to shorten a link in the highway between Halifax and
Tarboro, to wit, that part between Scotland Neck and Moore's Crossing.
In this case it is a complete abandonment of the entire road from be-
ginning to end as shown on the map from the county-seat of Durham
to the county-seat of Granville, and in rerouting the highway between
two points in different parts of the counties.  There they did not dis-
connect a principal town, as Hobgood (on the map) is on that part of
the highway system running from Halifax in Halifax County to Wil-
liamston in Martin County, and Speed was an unincorporated village
(not on the map).  In the instant case, the town of Stem, one of the
principal ones of the county (and on the map) is disconnected.

The town of Stem was made a party plaintiff, and alleged:

"That said town of Stem was incorporated in the year of 1911, and
now has a population of 300, and it is the second largest town in the
county of Granville, with the exception of Oxford, the county-seat of
said county, and is located on the present highway leading from Dur-
ham to Oxford, being twenty miles from Durham and eleven miles
from Oxford, and is one of the principal towns of the county of Gran-
ville.

"That the defendants were without authority to make a decision to
discontinue said highway through said town of Stem as a part of the
State system of highways, and to lay out and construct a new route by
the town of Creedmoor, which will cut the said town of Stem entirely
off from the said highway and will cause a great loss to the citizens
of said town, community and section in which it is located, who have
bought land and built homes along said highway upon the faith that
the same would be continued as a part of the State Highway system."

From all the facts as they appear from the entire record, I think the
State Highway Commission did not have the legislative power or
authority to run the State roads except through or near the towns as
set forth on the map; that by legislative mandate the towns named on
the map, by clear intent, were to remain on a highway running from
a county-seat to a county-seat and were *principal towns.*  I do not be-
lieve the bill would have been passed if the Legislature had thought that
the map was a "scrap of paper," and the towns named on the map
were put there with no meaning.  The Stem Route was taken over as
a part of the State Highway System, through Stem, by the State High-
way Commission, in accordance with the statute, and the road main-
tained by the State.  Counties can build all the roads they want to,

but this cannot be done at the expense of the State system, or by changing the legislative State Highway System Act to do so. If it can be done in this case, the legislative map is a nullity and should not have been put in the act.

The State Highway Engineer's report on this matter, which appears in the record, is in part as follows:

Conclusion: "The saving of cost in operation of vehicles on the Stem Route will outweigh the slightly greater cost of construction and small difference in distance. Moreover, flood conditions can be met with greater certainty on the Stem Route. *It is, therefore, my opinion that the engineering factors favor the Stem route.* (Italics mine.) The margin is not great, and other factors, such as local service, opening up a new section, and land values, which favor the Creedmoor route, should be balanced against the engineering features and the advisability of changing the State Highway from its present location on the Stem route."

W. C. Riddick made affidavit: "That in my opinion *it would not be safe to construct the bridge and embankment over Neuse River on the Creedmoor Route* (where the lowgrounds are low and broad), as was shown on the profile of the Highway Commission engineers. I further stated that should the Creedmoor Route be adopted *I did not believe the engineers of the Highway Commission, with the facts before them would take the risk of constructing the bridge and embankment as shown on said profile,*" and gave his reasons.

The Stem Route would cost about $20,000 less than the Creedmoor Route. The defendant's engineer, who surveyed these two roads, reported, *"It is, therefore, my opinion that the engineering factors favor the Stem Route."* Stem was, under the clear meaning of the law, a principal town (named on the map. Why?); so considered by the Legislature, and, in my opinion, neither this Court nor the State Highway Commission have the power to depart from the mandate of the Legislature and wipe from the road system of the State a road mapped as going through Stem (named on the map), taken over under the State Act, kept up by the State, and make an entirely new road and hard surface it at the cost of about $1,000,000. If it can be done in this case, it can be done anywhere in the State, and a great act may become a "football" between contending factions. Such was not the legislative purpose. The map and principal towns named on it were an orderly system, and if followed will make for peace.

On the entire record in this case and the findings of the court below, I go further than *Mr. Justice Adams*—that the Legislature was not only "not willing to confer such extended powers on the commission,"

but they did not—they limited them in going from county-seat to county-seat, to go by principal towns. The towns on the map were the principal towns in the minds of the Legislature when the act was passed.

The creator of this act, the Legislature, used language positive and unequivocal: "No roads shall be changed, altered or discontinued so as to *disconnect* principal towns." The only town on that route on the map was Stem. To disconnect Stem will make the act senseless and meaningless.