J. O. STYERS, R. C. PFAFF AND ROBERT G. SCHULTZ v. CRAIG PHILLIPS, SUPERINTENDENT OF PUBLIC EDUCATION OF NORTH CAROLINA; A. C. DAVIS, CONTROLLER, STATE BOARD OF EDUCATION; EDWIN GILL, TREASURER OF NORTH CAROLINA; AND GEORGE S. LAMBERT, STATE DISBURSING OFFICER

No. 71

(Filed 20 January 1971)

1. **Schools § 16— definition of "intra-city transportation" of school pupils**

    The term "intra-city transportation" means the transportation of public school pupils living within the boundaries of any municipality to a school located therein but more than one and one-half miles from the residence of the pupil. G.S. 115-183(4).

2. **Trial § 18— sufficiency of evidence to support material issue — question for court**

    Whether there is enough evidence to support a material issue is always a question for the court.

3. **Appeal and Error § 58 —review of injunctive proceeding — power of Supreme Court to find facts**

    Upon appeal from an order granting or refusing an interlocutory injunction, the Supreme Court is not bound by the findings of fact of the trial court but may review the evidence and make its own findings of fact.

4. **Schools § 16— school buses — State Board of Education**

    The State Board of Education has been relieved of all responsibility for the operation of school buses by G.S. 115-181(a).

5. **Schools § 16— bus transportation — discretion of local board**

    Whether any school board shall operate a bus transportation system is a matter in its sole discretion. G.S. 115-180.

6. **Schools § 16— transportation of rural pupils to urban schools — transportation of urban pupils to same schools**

    A city school board is not required to transport pupils living in the city and attending schools located therein even though transportation to those same schools is furnished pupils living outside the city. G.S. 115-186(e).

7. **Schools § 16— school bus transportation — allocation of funds by State Board — location of pupils' residences**

    Plaintiffs' contention that it would be illegal for the State Board of Education to allocate funds for the transportation of any class of pupils other than the five classes enumerated in Ch. 990, Session Laws of 1969, *held* without merit.

8. **Schools § 16— intra-city transportation of pupils — G.S. 115-186(e)**

    G.S. 115-186(e) does not forbid either the State Board of Education or the local boards to supply funds for the intra-city transporta-

Styers v. Phillips

tion of pupils, the statute merely declaring that the transportation of pupils who live outside the city limits in which the school they attend is located does not impose a correlative *duty* to transport pupils who live within the city and attend the same school.

9. **Schools § 16; Statutes § 5— legislative intent — testimony by legislator — legislative bills which failed to pass**

Neither testimony by a former member of the legislature nor bills which were introduced in the legislature and died in committee were competent to show the legislature's intention in making an appropriation for transportation of public school pupils, since the intention of the legislature cannot be shown by the testimony of a member nor ordinarily by its failure to act.

10. **Schools § 16— intra-city transportation of school pupils — allocation by State Board of Education**

The State Board of Education had authority under G.S. 115-181(f) to make an allocation for the intra-city transportation of public school pupils from the funds appropriated by the General Assembly for transportation purposes during the 1970-71 school year, and the Board did in fact make such an allocation.

11. **Schools § 16— transportation of urban pupils — authorization by State Board — irrelevancy of court's finding**

In this action to restrain the expenditure of State tax funds for the intra-city transportation of public school pupils, purported finding by the trial court that "there is no evidence that the State Board of Education has authorized the transportation" of urban pupils to any school is irrelevant, since the State Board does not authorize the transportation of any pupils, but only allocates funds to those boards which elect to operate transportation systems.

12. **Public Officers § 8— official acts — presumption of regularity**

Absent evidence to the contrary, it is presumed that public officials have discharged their duties in good faith and have exercised their powers in accord with the spirit and purpose of the law, the burden being on the party asserting the contrary to overcome the presumption with competent and substantial evidence.

13. **Schools § 16; Public Officers § 8— failure of State Board officially to allocate school bus funds — burden of proof — failure of proof**

Plaintiffs had the burden of proving their contention that the State Board of Education has never officially made any allocation of funds for the intra-city transportation of pupils, and the contention is without merit where the case on appeal is devoid of any evidence of such failure and contains no suggestion that State Board minutes were unavailable or nonexistent.

14. **Schools § 16— acceleration of use of school bus funds — authority of State Board**

The State Board of Education had authority under G.S. 115-181(g) to accelerate the allocation and expenditure of the legislative appropriation for the transportation of public school pupils for the 1970-71

school year even though such acceleration will exhaust the appropriation by April 1971.

15. **State § 4— illegal diversion of public funds — standing of individual to enjoin**

An individual has standing to contest an allegedly illegal diversion of public funds which will injuriously affect his rights individually or as a citizen and taxpayer.

16. **Schools §§ 5, 16; State § 4— expenditures for intra-city transportation of pupils — taxpayer suit to enjoin — standing to maintain action**

In this action by three taxpayers to enjoin the expenditure of state funds for the intra-city transportation of public school pupils, the Supreme Court has assumed, without deciding, that plaintiffs *might* be adversely affected in some way if funds appropriated for the transportation of public school pupils were illegally diverted and that plaintiffs have standing to maintain the action.

Justice MOORE did not participate in the consideration or decision of this case.

Justice HIGGINS concurring in result.

Justice LAKE dissenting.

APPEAL by defendants from *Bailey, J.,* September 1970 Session of WAKE, transferred for initial appellate review by the Supreme Court under an order entered pursuant to G.S. 7A-31(b)(4).

Plaintiffs are three residents of Forsyth County who pay income taxes, "as well as other State taxes," to the State of North Carolina. Defendants are Dr. Craig Phillips, Superintendent of Public Instruction of North Carolina, *ex officio* member of the State Board of Education (State Board) and its secretary; A. C. Davis, Controller of the State Board; Edwin Gill, State Treasurer; and George S. Lambert, State Disbursing Officer.

In their complaint, filed 3 September 1970, plaintiffs allege: (1) Defendants are spending tax funds which the State "collected from these plaintiffs" for the transportation of pupils living in Winston-Salem and other cities and towns of North Carolina to and from public schools located within their respective municipalities. The expenditure of tax funds for this purpose is unauthorized by law and therefore illegal. (2) Defendants Phillips and Davis have supplied discarded school buses gratuitously to city boards of education for the transportation of urban

school children to public schools located within "the towns in which they reside, and the defendants are spending tax funds collected from these plaintiffs" for the operation and maintenance of these buses. Plaintiffs, who sue as individuals and not as representing taxpayers generally, pray an injunction restraining defendants from spending tax funds for the transportation of any city pupils to and from schools located within the municipality in which they live and from supplying discarded school buses for that purpose.

Answering the complaint, defendants deny that they have spent, or plan to spend, tax funds for any unauthorized purpose. They aver that the General Assembly has authorized the State Board to allocate to the respective county and city boards of education all funds which it appropriates for the purpose of providing transportation to pupils enrolled in the State's public schools. Defendants also deny that they have transferred any school buses to city boards of education.

Defendants moved to dismiss the action because, *inter alia,* plaintiffs lack standing to maintain the suit.

On 21 September 1970, Judge Bailey heard plaintiffs' motion for a preliminary injunction pending the final trial. Both plaintiffs and defendants offered evidence. On 24 September 1970, Judge Bailey issued a preliminary injunction to become effective on 6 October 1970 and to remain in force until the further order of the court. His order restrained defendants, their agents, and all others receiving notice of the injunction, from "expending, disbursing and making available for spending tax funds of the State" for the intra-city transportation of public school pupils in any of the municipalities of the State. The order did not restrain defendants from supplying discarded school buses for the transportation of urban pupils to schools within the city limits.

Defendants appealed from Judge Bailey's order and, on 30 September 1970, petitioned this Court to stay the operation of the injunction pending the appeal. Plaintiffs, by answer, opposed the requested stay. A majority of the Court being of the opinion that the preliminary injunction should be suspended pending the hearing of defendants' appeal and the decision thereon, on 5 October 1970 an order was issued staying its opera-

tion. The evidence before Judge Bailey, which was without conflict, 'will be discussed in the opinion.

*Smith, Anderson, Dorsett, Blount and Ragsdale and Hatfield, Allman and Hall for plaintiff appellees.*

*Robert Morgan, Attorney General; Ralph Moody, Deputy Attorney General; and Andrew A. Vanore, Jr., Assistant Attorney General for defendant appellants.*

SHARP, Justice.

[1, 10]  The ultimate question which this appeal presents is whether the State Board of Education has authority to allocate funds from the General Assembly's 1970-71 appropriation for the Nine Months School Fund to city and county boards of education for the purpose of transporting urban pupils to and from schools located within the corporate limits of the cities and towns in which they live. This is a question of law, and the answer must be found in the enactments of the General Assembly. *D & W Inc. v. Charlotte*, 268 N.C. 577, 151 S.E. 2d 241. The term "intra-city transportation" as used herein means the transportation of public school pupils living within the boundaries of any municipality to a school located therein but more than one and one-half miles from the residence of the pupil. G.S. 115-183 (4).

Plaintiffs contend, and Judge Bailey held, that the General Assembly had appropriated no money for the purpose of providing urban transportation to pupils living within corporate limits as they were fixed in 1957 and that defendants could not lawfully disburse tax funds for that purpose. Plaintiffs also contend that the State Board has never officially made any allocation of funds for the intra-city transportation of pupils; that the action taken was that of defendants Phillips and Davis. Judge Bailey made a "finding" that there was no evidence before him "that the State Board of Education has authorized the transportation" of urban pupils to any school, and plaintiffs assert that is a finding of fact in accordance with their contention.

[2, 3]  Whether there is enough evidence to support a material issue is always a question of law for the court. 7 N. C. Index 2d *Trial* § 18 (1968). However, "[u]pon an appeal from an order granting or refusing an interlocutory injunction, the findings

of fact, as well as the conclusions of law, are reviewable by this Court." *Deal v. Sanitary District*, 245 N.C. 74, 76-77, 95 S.E. 2d 362, 364. In a situation such as this, factual findings made by the Judge of the Superior Court are not conclusive upon us. The Supreme Court may review the evidence and make its own findings of fact. *Cameron v. Highway Commission*, 188 N.C. 84, 123 S.E. 465. Our first task, however, is to determine whether the law authorizes the State Board to make an allocation for the intra-city transportation of public school pupils from the funds appropriated by the General Assembly to the Nine Months School Fund for transportation purposes.

[4]  School transportation is governed by Article 22 of Chapter 115 of the General Statutes, which was enacted in 1955. In that year the General Assembly relieved the State Board of Education of all responsibility for the operation of school buses. G.S. 115-181(a) ; *Huff v. Northampton County Board of Education*, 259 N.C. 75, 130 S.E. 2d 26. At the same time it enacted G.S. 115-180 which, in pertinent part, provides: "Each county board of education, and each city board of education is hereby authorized, but is not required, to acquire, own and operate school buses for the transportion of pupils enrolled in the public schools of such county or city administrative unit. . . . "

[5, 6]  It was specifically provided in G.S. 115-186(e) that there is no duty upon the State or any county or city "to supply any funds for the transportation of pupils, or any duty to supply funds for the transportation of pupils who live within the corporate limits of the city or town in which is located the public school in which such pupil is enrolled or to which such pupil is assigned, even though transportation to or from such school is furnished to pupils who live outside the limits of such city or town." Thus, it is quite clear that whether *any* school board shall operate a bus transportation system is a matter in its sole discretion, and that a city board is not required to transport pupils living in the city and attending schools located therein even though transportation to those same schools is furnished pupils living outside the city.

The only authority and control which the State Board has over the transportation of pupils is that provided in Article 22 of N. C. General Stats., Ch. 115. The Board is required by G.S. 115-181(d) to adopt safety regulations with reference to

the construction, maintenance, and operation of school buses. Upon the request of any city or county board of education, G.S. 115-181 (e) authorizes the State Board to give advice with reference to the establishment of school bus routes, the acquisition and maintenance of buses, and any other question which may arise in connection with the operation of a school bus transportation system.

G.S. 115-181 (f) requires the State Board to allocate "to the *respective county and city boards of education* (that is those which have elected to operate school buses) all funds appropriated from time to time by the General Assembly for the purpose of providing transportation to the pupils enrolled in the public schools within this State." The statute requires the allocation to be made on a fair and equitable basis, *according to the needs of the respective county and city administrative units* and so as to provide the most efficient use of such funds. The State Board is instructed to consider the number of pupils to be transported, the length and condition of bus routes, and any other pertinent facts affecting the cost of transportation. The State Board is directed to make the allocations at the beginning of each fiscal year, but it may reserve for future allocation during the fiscal year, as the need therefor shall be found to exist, an amount not to exceed ten percent (10%) of the total funds appropriated for transportation. (All italics are ours.)

After the State Board has allocated the transportation appropriation, G.S. 115-181 (g) directs that the funds "shall be paid over *to the respective county and city boards of education* in accordance with such allocation in equal monthly installments throughout the regular school year: Provided, however, that upon the request *of a county or city board of education,* the State Board of Education may, in its discretion, pay over *to the county or city board* all or any part of any or all monthly installments prior to the time when the same would otherwise be payable. *The respective county and city boards* shall use such funds for the purpose of replacing, maintaining, insuring, and operating public school buses and service vehicles in accordance with the provisions of this subchapter, and for no other purpose, but in the making of expenditures for such purposes shall be subject to no control by the State Board of Education." (Emphasis added.)

In 1957, the General Assembly enacted G.S. 115-190.1, *viz.*:

"In each and every area of the State where school bus transportation of pupils to and from school is now being provided such school transportation shall not be discontinued by any State or local governmental agency for the sole reason that the corporate limits of any municipality have been extended to include such area since February 6, 1957, and school bus transportation of pupils shall be continued in the same manner and to the same extent as if such area had not been included within the corporate limits of a municipality."

In 1963 the foregoing section (G.S. 115-190.1) was repealed. At the same time the General Assembly enacted G.S. 115-181.1, which placed "upon the State, the State Board of Education in its use of funds appropriated by the State for school transportation, and any county or city administrative unit which elects to provide school transportation, the same duty to supply funds for the transportation of pupils who live within the corporate limits of a municipality in which is located a public school in which such pupils are enrolled or assigned as that required for transportation to or from school of any other pupils residing within the county or city administrative unit." N.C. Sess. Laws, Ch. 990 (1963).

The effective date of G.S. 115-181.1 was "from and after July 1, 1965." Prior to that date, by Chapter 1095 of the Session Laws of 1965, effective July 1, 1965, the legislature repealed G.S. 115-181.1 and re-enacted G.S. 115-190.1 in its original form. Thus, legislative approval of the policy of transporting some city children and not others to schools located within the corporate limits (given in 1957) was never actually withdrawn.

In August 1969, a three-judge panel in the U. S. District Court for the Middle District of North Carolina held that G.S. 115-190.1, by denying transportation to urban pupils residing in areas which were within the boundaries of a municipality on 6 February 1957, while providing it for those living in areas annexed by the city after 6 February 1957, violated the equal protection clause of the Constitution of the United States. *Sparrow v. Gill*, 304 F. Supp. 86. The State accepted this decision as correct and did not appeal to the United States Supreme Court. The Federal District Court enjoined the State from providing funds for the transportation of any pupils within a municipality

unless it provided transportation on an equal basis for all pupils residing within the city and living more than one and one-half miles from the school to which they were assigned. The implementation of the federal injunction was stayed until 1 August 1970.

As a result of the decision in *Sparrow,* a number of school boards had to decide whether to discontinue the transportation of about 41,000 children living in areas which had been annexed by municipalities since 6 February 1957 or to transport approximately 57,000 more. The State Board was faced with the problem of allocating the appropriation for the school year 1970-71, which was inadequate to provide this additional transportation.

For the fiscal year 1970-71, the General Assembly, by Chapters 807 and 1103 of the N. C. Session Laws of 1969, appropriated $465,366,589.00 to the State Board of Education for the Nine Months School Fund. This appropriation, as declared by G.S. 143-23, was for the purpose and objects enumerated in the itemized requirements of the State Board of Education as submitted to the General Assembly by the Director of the Budget and the Advisory Budget Commission (or as amended by the General Assembly). Pursuant to the requirements of the Executive Budget Act (N. C. Gen. Stats. Ch. 143, art. I), the Budget Division of the Department of Administration prepared for the State Board of Education a statement (Budget Advice) of its appropriation and the purposes and objects for which the funds could be used. This Advice (under Purpose 66, Auxiliary Agencies, Line 661, Transportation) allotted $14,410,682.00 of the total Nine Months School Fund Appropriation to bus transportation.

The State Board's first attempt to meet the crisis created by the decision in *Sparrow* was to request the Governor as Director of the Budget and the Advisory Budget Commission, in the exercise of authority granted to them by G.S. 143-23, to make a transfer of funds as between objects and items in its budget. Specifically, the State Board requested that it be allowed to transfer $1,796,150.00 appropriated for "lapsed" instructional salaries, retirement, and social security contributions, to Code 66 (transportation). On 9 June 1970 the Advisory Budget Commission denied this request for a transfer of funds. However, noting that the "Budget of the State Board of Education, Nine Months School Fund, provides more than $15,800,000.00 for

School Bus transportation in 1970-71," the Commission issued the following directive:

"The Governor and the Advisory Budget Commission have authorized the State Board of Education to expend from these funds ($15,800,000.00) the amounts necessary to provide for the transportation of urban school children affected by the recent federal court ruling, from the beginning of the 1970-71 school year until such time as the 1971 General Assembly convenes.

"The Governor at that time will determine if, and in what amount, additional funds will be required to provide for continuation of transportation for urban school children for the remainder of the 1970-71 school year, and he will submit an emergency appropriation bill for this purpose for the consideration of the General Assembly."

Following the advice received from the Governor and the Advisory Budget Commission, the State Board, which—according to Mr. Davis—had previously thought it could not allocate funds for the intra-city transportation of children residing within municipal limits as they existed in 1957, allocated funds to city boards of education for that purpose.

In a further effort to assist city and city/county boards of education meet the transportation crisis, defendants Phillips and Davis directed the State Board's division of transportation to request the cooperation of other school administrative units in making available to these boards their discarded buses on a temporary basis. Between June 19 and September 4, 1970, four hundred, seventy-eight (478) of these discarded buses—all of which had been in use during the school year 1969-70—were transferred from one unit to another. Title, which had been in the name of the unit using the bus (G.S. 115-188(d)) was lodged in the board which would use the bus during 1970-71. No funds were involved in these transfers.

At the hearing before Judge Bailey, Dr. Phillips testified that, under the allocations made by the State Board, transportation appropriation funds are being and will be spent for intra-city transportation in Winston-Salem and other cities. In consequence of the accelerated use of these funds and the transfer of the discarded school buses, as of 18 September 1970, bus transportation

was being provided by 114 boards of education for 111,500 urban pupils assigned to schools located within 142 municipalities. Mr. Davis estimated that the 1970-71 transportation appropriation would be exhausted by April 1971.

[7] In support of their contention that the legislature has never authorized the expenditure of tax funds for the intra-city transportation of pupils and that such expenditures are contrary to State policy and illegal, plaintiffs rely upon the recitals in N. C. Sess. Laws, Ch. 990 (1963). These recitals are that in June 1963 the State Board was allocating funds for the purpose of providing transportation for five classes of pupils: (1) Those residing outside municipalities and attending schools located outside municipalities; (2) Those residing outside municipalities and attending schools located inside municipalities; (3) Those residing inside municipalities and attending schools located outside municipalities; (4) Those residing in territory annexed by a municipality after 6 February 1957 and attending schools within the same municipality, when transportation was provided in such area prior to annexation; and (5) Those residing in one municipality but attending schools in another. G.S. 115-181.1, had it not been repealed, would have created a sixth classification—city pupils residing within corporate limits as they existed prior to February 1957. Plaintiffs argue that the five classes of pupils enumerated in N. C. Sess. Laws, Ch. 990 (1963) were the only ones for whose benefit the State Board was then allocating the funds appropriated for transportation and that, after the repeal of G.S. 115-181.1, allocations for any other class would be illegal.

This argument overlooks the fact that in providing transportation for class (4) pupils, tax funds had been and were being spent for intra-city transportation with specific legislative sanction. It ignores the clear wording of G.S. 115-180 which, both before and after the advent of G.S. 115-181.1, has continuously authorized a city board of education, *without limitation*, to transport all pupils residing within the unit. It fails to take into account that the only statutory restriction upon Code 66 funds is that they be used for transportation purposes; that neither the Appropriation Act nor the Budget Advice earmarked transportation funds for the transportation of children with reference to the location of their residence, the location of the school to which they were assigned, or any other criteria. It disregards

the mandate in G.S. 115-181 (f) that the State Board shall fairly and equitably allocate to the county and city boards electing to operate transportation systems all funds which the legislature had appropriated for transportation. The 1963 repeal of G.S. 115-186 (e) and the enactment of G.S. 115-181.1, followed in 1965 by the re-enactment of the former and the repeal of the latter before its effective date, cannot becloud the clear wording of G.S. 115-180 and G.S. 115-181 (f).

Plaintiffs argue (1) that in *Sparrow* the Attorney General took the same position which they take here, that is, that G.S. 115-186 (e) *prevents* the State Board from allocating funds for the intra-city transportion of students, and (2) that the opinion of the Attorney General "ought to be strongly considered by this Court." Although the construction of G.S. 115-186 (e) was not before the three-judge court in *Sparrow,* it did not endorse this interpretation of the statute. If that was the Attorney General's position in that case, it is not his position in this one. We have considered both and conclude that the second position is correct.

[8] G.S. 115-186 (e) does not forbid either the State Board or local boards to supply funds for the intra-city transportation of pupils. This section merely declares that the transportation of pupils who live outside the city limits in which the school they attend is located does not impose a correlative duty to transport pupils who live within the city and attend the same school. This classification is entirely reasonable, since ordinarily school children can obtain both private and public transportation more easily in the cities than in rural areas. In any event, a statute which merely relieves the city boards of any *duty* to provide transportation cannot be construed as a *prohibition* against providing it—especially in the face of G.S. 115-180, which grants to city boards, without limitation, the authority to operate transportation systems.

Plaintiffs further contend that because the legislature has never made an appropriation large enough to provide intra-city transportation and because Code 66 appropriations for the school year 1970-71 were insufficient to provide it for the city boards electing to operate transportation systems, the legislature manifested its intention that no tax funds should be spent for intra-city transportation.

[9] In an effort to show the legislative intent with reference to the 1970-71 appropriation in question, plaintiffs offered the testimony of Mr. Claude Hamrick, a former member of the General Assembly (House of Representatives) from 1961 through 1967. Over defendants' objection and exception, Judge Bailey permitted Mr. Hamrick to testify that in 1967 he and others introduced a bill in the House which would have re-enacted G.S. 115-181.1 as passed in 1963 and repealed in 1965. This bill and a similar one introduced in the Senate in 1969 died in committees. Over defendants' objection and exception these bills were admitted in evidence.

In his order Judge Bailey declared that "no finding of fact or conclusion of law herein is based in any manner or particular upon any bills which were introduced in the General Assembly which failed of passage. . . . " In their brief, however, plaintiffs refer to the testimony of Mr. Hamrick and to the 1967 and 1969 bills. They contend this evidence shows the legislature's intention to reject intra-city transportation of pupils and that this Court should consider this evidence even though Judge Bailey did not. Not so. Both Mr. Hamrick's testimony and the bills were incompetent. The intention of the legislature cannot be shown by the testimony of a member; it must be drawn from the construction of its acts. *D & W Inc. v. Charlotte, supra.* Furthermore, the rule is that ordinarily the intent of the legislature is indicated by its actions, and not by its failure to act. 50 Am. Jur. *Statutes* § 326 (1944).

In *James v. Young,* 77 N.D. 451, 43 N.W. 2d 692, 20 A.L.R. 2d 1086, it was held that the legislature's failure to pass a bill "cannot be said to indicate any intent on the part of the legislature. A public policy is declared by the action of the legislature, not by its failure to act." *Accord, Reed v. Huston,* 24 Idaho 26, 132 p. 109. In *Moore v. Board of Freeholders of Mercer County,* 76 N.J. Super. 396, 184 A. 2d 748, the defendants argued that the failure of the legislature to pass a bill specifically authorizing a citizen to photocopy public records indicated a denial of the right. The court said, "[W]e decline to attribute any such attitude to the legislature. Defendant's conclusion can be nothing more than conjecture. Many other reasons for legislative inaction readily suggest themselves." In *United States v. Allen,* 179 F. 13 (8th Cir.) the court said, "Courts can find the intent of the legislature only in the acts which are in fact passed, and

not in those which are never voted upon in Congress but which are simply proposed in committee."

**[10, 11]** We conclude (1) as a matter of law, that the State Board was authorized and directed by G.S. 115-181 (f) to allocate without restriction the funds appropriated for transportation during the school year 1970-71 to the boards of education which had elected to provide school bus transportation; and (2) as a matter of fact, that the State Board did make the allocation which the statute required it to make. Plaintiffs' contention "that the State Board has not acted in the matter"; that any action taken was that of defendants Phillips and Davis; and that defendants Gill and Lambert have disbursed funds upon the orders of Phillips and Davis is not supported by the evidence. Judge Bailey's "finding" that "there is no evidence that the State Board of Education has authorized the transportation of these 111,500 pupils to any school" is irrelevant. The State Board does not *authorize* the transportation of any pupils; it allocates available funds to those boards which elect to operate transportation systems. It is true that plaintiffs introduced no minutes of the State Board. The oral evidence of its secretary and controller, however, tends to show that allocations were made.

**[12, 13]** Absent evidence to the contrary, it will always be presumed " 'that public officials will discharge their duties in good faith and exercise their powers in accord with the spirit and purpose of the law. . . . Every reasonable intendment will be made in support of the presumption.' " *Huntley v. Potter,* 255 N.C. 619, 628, 122 S.E. 2d 681, 686, 687. "[T]he burden is upon the party asserting the contrary to overcome the presumption by competent and substantial evidence." 6 N. C. Index 2d *Public Officers* § 8 (1968). Thus, the burden was upon plaintiffs to produce evidence that the State Board had failed to make the allocations required by G.S. 115-181 (f). The case on appeal is totally devoid of any evidence of such a failure and contains no suggestion that State Board minutes were unavailable or non-existent.

After the decision in *Sparrow* it was obvious that the funds appropriated for 1970-71 were insufficient to provide nine months transportation for all the units which then elected to operate a transportation system. Unless something was done, the public school education of many thousands of children would be

disrupted by a lack of transportation. Acting with the advice and consent of the Governor and the Advisory Budget Commission (which had refused to transfer funds from other objects and items in the State Board's budget to the purpose of transportation), the State Board allocated the Code 66 funds on a monthly basis sufficient to provide transportation in all the units electing to provide transportation until the funds were exhausted—about April, 1971.

[14] The final question posed by this appeal is whether the law sanctions such an accelerated allocation and expenditure of the transportation appropriation. We hold that it does. G.S. 115-181(g) expressly provides that the funds allocated for transportation "shall be paid over to the respective county and city boards of education in accordance with such allocation in equal monthly installments throughout the regular school year." However, it authorizes the State Board, upon request and in its discretion, to "pay over to the county or city board all or any part of any or all monthly installments prior to the time when the same would otherwise be payable." This is the authority which the State Board has, in effect, been exercising.

The Attorney General argues that authority to authorize the accelerated use of funds is a lesser power included in the authority which G.S. 143-23 gives to the Governor and the Advisory Budget Commission to make transfers or changes as between objects and items in the budget of the State Board of Education. We need not consider this contention in view of the authority which G.S. 115-181(g) gives to the State Board to accelerate payments to the local units. We note, however, plaintiffs' concession that "to accelerate the expenditure of money in the sense that the money may be spent for a legitimate purpose at a faster clip MAY be permissible." Plaintiffs base their case upon the premise, which we reject, that it is "clearly unlawful" to spend any funds for the intra-city transportation of pupils.

[15, 16] This suit is by three taxpayers to enjoin an allegedly unlawful use of public funds. The appeal presents no question of constitutional law. It is the rule with us that an individual has standing to contest an allegedly illegal diversion of public funds which will injuriously affect his rights individually or as a citizen and taxpayer. *Teer v. Jordan*, 232 N.C. 48, 59 S.E. 2d 359; *Freeman v. Madison County*, 217 N.C. 209, 7 S.E. 2d 354; 81

C.J.S. *States* § 191(b) (1953). Plaintiffs are citizens and residents of Forsyth County, an area in which the Winston-Salem/Forsyth County Board of Education is providing transportation for all pupils residing more than one and a half miles from the school to which they are assigned. Were plaintiffs residents of a county where their children might be deprived of bus transportation on and after 1 April 1971 because the expenditure of funds for intra-city transportation elsewhere had exhausted the transportation appropriation, there could be no doubt of their standing to maintain this action. That, however, is not their situation. Furthermore, were the expenditure of state funds for intra-city transportation to be enjoined, the action would not affect the income tax, sales tax, or any other tax which plaintiffs pay. Nevertheless, for the purpose of decision here, we have assumed, without deciding, that plaintiffs *might* be adversely affected in some way if funds appropriated for the transportation of public school pupils were illegally diverted.

We have interpreted the law as it has been written. The General Assembly is now in session and, in the light of present conditions, it may determine whether the transportation of more than one hundred thousand school children shall be discontinued before the end of this school year.

The order of Bailey, J. is

Reversed.

Justice MOORE did not participate in the consideration or decision of this case.

Justice HIGGINS concurring in result:

The plaintiffs, as individuals, brought this action in the Superior Court of Wake County against Dr. Phillips, State Superintendent of Public Instruction, *ex officio* member of the State Board of Education, A. C. Davis, Controller, State Board of Education, Edwin Gill, Treasurer of North Carolina, and George S. Lambert, State Disbursing Officer, seeking to restrain their official acts relating to the expenditure of State funds for transporting (by bus) pupils in Winston-Salem and other cities and towns to and from schools located within their respective cities.

The defendants answered and moved to dismiss on the ground the plaintiffs lacked standing to maintain the suit. If the pleadings present the question of the plaintiffs' right to maintain the action, and I think it does, other questions and the necessity for discussing them do not arise.

In the case of *Insurance Company v. Unemployment Compensation Commission,* 217 N.C. 495, 8 S.E. 2d 619, the plaintiff brought suit against the members of the Unemployment Compensation Commission of North Carolina. The court said: "An action against a commission or board created by statute as an agency of the State where the interest or rights of the State are directly affected is in fact an action against the State." In *Schloss v. Highway Commission,* 230 N.C. 489, 53 S.E. 2d 517, the court said: "That the sovereign may not be sued, either in its own courts or elsewhere, without its consent, is an established principle of jurisprudence in all civilized nations. (Citing many authorities). In the absence of consent or waiver, this immunity against suit is absolute and unqualified." In the case of *Insurance Company v. Gold, Commissioner,* 254 N.C. 168, 118 S.E. 2d 792, this court said: " 'An action against a commission or board created by statute as an agency of the State where the interest or rights of the State are directly affected is in fact an action against the State . . . . ' The State is immune from suit unless and until it has expressly consented to be sued. It is for the General Assembly to determine when and under what circumstances the State may be sued." See also *Electric Company v. Turner* 275 N.C. 493, 168 S.E. 2d 385.

I think this action should have been dismissed on the ground the plaintiffs failed to show the State had given its consent to be sued.

Justice LAKE dissenting:

Proceeds of State tax levies, appropriated by the General Assembly for one purpose, may not lawfully be disbursed by State officers for a different purpose. Constitution of North Carolina, Art. XIV, § 3; *State v. Davis,* 270 N.C. 1, 9, 14, 153 S.E. 2d 749, *cert. den., Nivens v. North Carolina,* 389 U.S. 828, 88 S.Ct. 87, 19 L. Ed. 2d 84; *Gardner v. Retirement System,* 226 N.C. 465, 468, 38 S.E. 2d 314. See, Art. V, § 7, of the new Constitution which takes effect July 1, 1971. Consequently, the question before us is whether the proposed disbursement by

the defendants of funds, appropriated by the General Assembly of 1969 for transportation of public school pupils, is, in part, for a purpose not intended by that General Assembly when it enacted the Appropriations Act of 1969.

The State Board is required by G.S. 115-181 (f) to allocate to the county and city boards, which elect to operate school buses, all funds appropriated by the General Assembly for the purpose of providing transportation to pupils enrolled in public schools. The allocation must be made in light of the number of pupils to be transported and all other circumstances affecting the cost of transportation, to the end that the total appropriation be divided fairly between such boards according to their respective needs. This allocation is required to be made at the beginning of the fiscal year, subject to a provision for holding a portion of the total appropriation in reserve, which provision is not here at issue.

G.S. 115-181 (g) authorizes the State Board to pay over to a particular county or city board, if so requested, all or any part of its allocation prior to the time such funds would normally be paid over to such board. This section of the statute, however, explicitly states that normally "all funds so appropriated by the General Assembly [and allocated by the State Board] shall be paid over to the respective county and city boards * * * *in equal monthly installments throughout the regular school year.*" (Emphasis added.)

Clearly, this statute contemplates that the Legislature will make an appropriation for transportation deemed by it sufficient to run the buses through the entire school year and that the appropriated funds will be allocated to that end. Thus, we must assume that the appropriation made by the General Assembly of 1969, for the 1970-71 school year, was intended by it to provide bus transportation throughout the entire school year for rural children attending schools in Dare and Cherokee Counties, and in other rural areas, as well as for children then contemplated as potential school bus riders in Winston-Salem, Charlotte and other cities. It is not contended that the appropriation actually made by the General Assembly of 1969 was not adequate for this purpose.

But for the decision of the Federal Court in *Sparrow v. Gill*, 304 F. Supp. 86, correctly summarized in the majority

opinion, and for the resulting election of certain city boards of education to comply therewith by greatly expanding the number of city pupils to be given bus transportation, this case would not be before us. That sequence of events so greatly enlarged the number of pupils to be transported that the appropriation made by the 1969 General Assembly will not suffice to supply transportation for all the children throughout the State, including new riders in the city, for the entire school year 1970-71.

*Sparrow v. Gill, supra,* has no effect upon the proper construction of the Appropriations Act of 1969. If it would have been unlawful for the State Board to have allocated, and for the defendants to have disbursed, the appropriation made for the year 1969-70 as the State Board has attempted to do, and as the defendants propose to do, with the appropriation for the year 1970-71, then the allocation and the proposed disbursement now before us was and will be unlawful. The majority opinion states that it was the opinion of the State Board's officers prior to August 1970 that it could not lawfully allocate the appropriation so as to provide funds for transporting children living in portions of the city not annexed since 1957. It is my view that those officers were right then and are in error now.

I agree with the majority that, upon this record, we must assume that the State Board, at the beginning of the 1970-71 fiscal year made an allocation of the total fund appropriated by the 1969 General Assembly for transportation of school children, which allocation, if lawful, would justify the proposed disbursements. The State Board did so by adding many thousands of city children to the bus riders contemplated by the 1969 General Assembly when it made the appropriation for the entire State for the entire school year. In so doing, the State Board necessarily took from the children of Dare, Cherokee, and other rural areas, the opportunity to ride to school after April first in order to provide for the new city bus passengers the opportunity to ride up to that date.

Of course, in so doing, the State Board acted in the hope that the 1971 General Assembly will appropriate additional funds sufficient to enable all the children to ride buses to and from school throughout the school year. There is no duty imposed by law upon the 1971 General Assembly to do so. At the time Judge Bailey was required to act and now, when we are re-

quired to do so, there was and is no way of knowing whether this hope of the State Board will be realized. We must decide this case on the assumption that no further appropriation will be made. Judge Bailey was required, and we are now required, to determine the authority of the State Board, thus to jeopardize the rural child's opportunity in order to afford transportation to the city child, without any assurance that, if the State Board's action is sustained, the entire school system of school bus transportation will not cease to operate on or about April first. Can the rural children lawfully be thus deprived of bus transportation after April first?

The majority opinion is clearly correct in saying that each city board may determine for itself, free from any control by the State Board, or other State agency, whether it will or will not operate school buses. G.S. 115-180. Thus, when the decision of the Federal Court in *Sparrow v. Gill, supra,* made it impossible for a city board to continue to provide bus transportation for children living in areas annexed to the city since 1957, unless it also provides such transportation for other children similarly situated in other areas of the city, each city board was, and is, free to choose between providing bus transportation for all such children or for none. That is not the question before us. The question before us is whether the State Board had authority to allocate to a city board, electing to provide transportation for all, a larger share of the appropriation made by the 1969 General Assembly than otherwise would be proper for the reason that the city board has so elected to transport all; that is, has elected to transport children not contemplated as bus riders by the 1969 General Assembly.

I do not find in the provision of G.S. 115-181(g), authorizing accelerated payments of allocation installments, any support for what the State Board undertook to do. It has not only accelerated payments of allocation installments. It has allocated the appropriation so as to shift funds from county boards to city boards, or to some city boards, with the result that all of them will run out of money about the first of April, which was clearly not the intent of the 1969 General Assembly.

At first glance, G.S. 115-181(f) seems to require the State Board at the start of a fiscal year to divide the total appropriation made by the 1969 General Assembly for school bus opera-

tion among the county and city boards, electing to operate buses, on the basis of the number of pupils each such board determines to transport. If that view be taken, any one of these three things can happen when, as here, the allocated funds will all be exhausted before the school year ends: (1) The buses will stop running, (2) the 1971 General Assembly will come to the rescue with an additional appropriation, or (3) the county and city boards will operate their respective bus fleets with local funds for the rest of the year.

If, on the other hand, the State Board, in allocating the appropriation made by the 1969 General Assembly, could not lawfully take into account the children who live in the parts of the city other than those annexed since 1957, which children the city board has now elected to transport, in deference to the decision of the Federal Court, and so the disputed disbursements are enjoined, these are the possibilities: (1) The county boards will operate their buses throughout the entire school year, and (2) the city boards' buses 'will (a) stop operating when the lawfully allocated funds are exhausted, or (b) will be operated thereafter by local funds, or (c) the 1971 General Assembly will make a further appropriation to enable these buses to operate.

Judge Bailey's order restrained the defendants from "making available for spending" by city boards any "tax funds of the State" for transportation of children living in the city to public schools within the city. This goes too far. A disbursement to a city board pursuant to a re-allocation, taking into account only those city pupils living in areas annexed to the city since 1957, would clearly be within the right and duty of the defendants, if the remaining transportation needs of the city board are met with local funds. It would not run counter to the decision of the Federal Court in *Sparrow v. Gill, supra.*

The Sparrow case dealt with the right of children living in an older part of the city to ride a public school bus, so long as other children living in areas annexed to the city since 1957 are provided such transportation. It was not concerned with how the cost was to be divided between the State and the city, nor with whether all city school buses were to operate for all or only a part of the school year. It recognized that the Constitution of the United States does not forbid a State to distinguish, in this matter, between urban and rural children. Thus, if the

State Board, at the start of the fiscal year 1970-71, had allocated the total fund appropriated for school bus transportation in such year on the same basis as that used in the allocation for 1969-70, and if the city board's need for additional funds to transport all its pupils, living beyond the specified distance from their respective schools, were met locally, the decision in the Sparrow case would be carried out and the appropriated State funds would have been used as the 1969 General Assembly contemplated. Consequently, Judge Bailey's order should, at least, be modified.

Does G.S. 115-181 (f) forbid such allocation of the appropriation made by the 1969 General Assembly? I think not. No session of the General Assembly can bind its successor. The 1969 General Assembly was free to determine for what purpose money appropriated by it might be spent. The question is, how did it mean for its appropriation to be spent?

Nothing else appearing, G.S. 115-181 (f) would lead me to the conclusion that the 1969 General Assembly meant for the appropriation to be allocated to the county and city boards just as was done by the State Board. However, something else does appear which brings me to a different conclusion.

The Governor's Budget Message to the 1969 General Assembly expressly requested an appropriation for transportation sufficient to include the cost of busing children living in areas of the city other than those annexed since 1957. This, of course, was prior to the decision in *Sparrow v. Gill, supra.* This was what is known as a B-Budget request; *i.e.,* an appropriation in addition to that deemed sufficient to continue former busing practices. Specifically, the Governor said to the 1969 General Assembly in this message:

> "Further, public school bus transportation should be extended to include urban and suburban children. As long as the State assumes responsibility for school transportation, with all taxpayers supporting it, this service should not be limited to rural children who live more than one and one-half miles from the school."

A bill to put this recommendation into effect, Senate Bill No. 91, was introduced in the General Assembly of 1969. It specifically directed the State Board to take into consideration, in allocating the appropriation for school bus transportation, all

children living within a municipality on the same basis as rural children. That is, this bill specifically provided for allocation of the appropriation for school bus transportation on the basis that children living in parts of a city, other than those annexed to the city since 1957, would be carried to and from public schools by bus, if they lived the required distance from the school. It specifically provided for an appropriation of $1,609,-631 for the accomplishment of this purpose (the transportation of such city children) in the fiscal year 1969-70, and $1,688,921 to do the same in the fiscal year 1970-71. Senate Bill No. 91 was referred to the Appropriations Committee. It was not approved and died in that committee.

Only the A-Budget provision for public school transportation was approved and enacted by the General Assembly of 1969. That is, the appropriation, the allocation of which we now have before us, was made by a General Assembly, which was specifically requested to appropriate money for transportation of city children not theretofore considered by the State Board in making allocations and said, "No."

I can find no basis for doubt that the 1969 General Assembly intended for its appropriation to be divided among the county and city boards without taking into account the desire of any city board, under pressure of a Federal Court decision or otherwise, to transport city children residing in parts of the city not annexed since 1957. That being true, the allocation for the fiscal year 1970-71 made by the State Board is unlawful and will not authorize disbursement of State funds by the defendants. The State Board should make a re-allocation of the appropriation made by the 1969 General Assembly and disbursements heretofore made to the respective county and city boards should be charged against such new allocations.

I also dissent from the holding of the majority opinion that the admission in evidence of bills introduced in the 1967 and 1969 Sessions of the General Assembly was error. Our decision in *D & W, Inc., v. Charlotte,* 268 N.C. 577, 151 S.E. 2d 241, does not support the majority's position in this case. There we were concerned with an affidavit of a member of the Legislature offered in evidence to show what the Legislature intended by a statute which it enacted. Of course, as we there held, that is not competent. Here the evidence shows the Legislature's action,

not some member's opinion about what the action was intended to do. What the General Assembly did, including what it refused to do, may properly be considered by the courts of this State in construing the meaning of its enactment. "In determining the meaning of a statute, it is proper to consider *contemporary* action of the legislature." 50 AM. JUR., Statutes, § 326. (Emphasis added.)

It is true that the defeat of a bill making an action mandatory does not necessarily show an intent to prohibit such action voluntarily undertaken, nor does it necessarily show an intent to exclude such voluntary action from the benefit of an appropriation made by another act of the Legislature. Whether or not rejection of proposed legislation, either on the floor or in committee, is a valuable indication of what the Legislature intended by the statute which it enacted, depends on the nature of the rejected proposal and its relation in time and content to the enacted statute. A contemporaneous rejection of a proposal to appropriate for a specified purpose clearly indicates an intent to omit such purpose from the appropriation made. The majority's sweeping declaration that the Legislature's inaction or refusal to act does not show the proper construction to be placed on what it did enact is too broad.

The refusal of the 1969 General Assembly to accept the Governor's recommendation and B-Budget request for an appropriation to do what the State Board has undertaken to approve is certainly a part of the legislative history of the very appropriation we are considering. In my opinion, it is most persuasive. With the wisdom or lack of wisdom of this legislative decision, we may not properly concern ourselves in this case, nor may we properly construe its action by conjecture as to what it would have done if it had been given the wisdom to foresee what the Federal Court was later to decide in *Sparrow v. Gill, supra.*

I would, therefore, modify and affirm Judge Bailey's order.