Justice HUDSON,
concurring in the result only.
I write separately because, while I concur that defendants’ offenses are covered by the plain language of N.C.G.S. § 90-95(h)(4), I find the result troubling in that it may permit prosecution of some persons whose activities are beyond the intended reach of the original legislation.
The legislative intent behind subsection 90-95(h) shows that the law was meant to punish large-scale distributors of illegal drugs. The *445 public papers of Governor Hunt, who requested that the General Assembly enact the measure, show such intent:
We must strengthen our commitment to fighting the big-time drug dealer who has been driven to North Carolina by strong laws which have been enacted in states like Florida.
We need the same sort of tough laws in North Carolina. For that reason, we will present to the General Assembly next month emergency legislation which will impose extremely harsh mandatory prison terms and large fines for those persons convicted of dealing in large quantities of four kinds of drugs which have become a serious problem. These are marijuana, methaqualone, cocaine, and opium derivatives.
This legislation will not change the penalties for those convicted of the possession, manufacture, or sale of those drugs in small quantities as provided in the current law. But for those who are obviously dealing for profit, the penalties will be very tough.
James Baxter Hunt, Jr., Governor of N.C., Statement on Increased Penalties for Drug Dealers (May 21,1990), in 1 Addresses and Public Papers of James Baxter Hunt, Jr. (Memory F. Mitchell ed., 1982) at 735 (emphases added) (footnote omitted). Whether prescription pills were intended to be covered by the statute is immaterial: the point of subsection 90-95(h) was, and still is, to punish large-scale drug traffickers. Punishments for end users are codified in § 90-95(d).
But here defendants Ellison and Treadway were charged with trafficking when they were arrested for buying and selling, respectively, a single end-user amount of ninety Lorcet pills. Under this interpretation of the statute, a defendant would need to possess a mere five Lorcet pills (less than the daily maximum dosage) to be charged with trafficking. While the State maintained at oral argument that such an occurrence is unlikely, it has already happened. In State v. Burrow, — N.C. App. —, 721 S.E.2d 356, vacated and remanded on other grounds, — N.C. —, 736 S.E.2d 484 (2012) (per curiam order), argued a month after these cases, the defendant was convicted of trafficking by possessing only twenty-four oxycodone pills. In addition, this Court has considered numerous Petitions for Discretionary Review involving similar fact patterns. See, e.g., State v. McAllister, — N.C. App. —, 731 S.E.2d 276, 2012 WL 3571069 (2012) (unpublished) (upholding a trafficking conviction based on nine oxycodone pills), disc. rev. denied, 736 S.E.2d 491 (2013); State *446 v. Seamster, — N.C. App. —, 716 S.E.2d 440, 2011 WL 4553120 (2011) (unpublished) (involving a conviction for twenty hydrocodone pills), disc. rev. denied, 722 S.E.2d 606 (2012). The Court of Appeals has also apparently seen these types of charges in cases that were not appealed to this Court. See, e.g., State v. Davis, — N.C. App. —, —, 733 S.E.2d 191, 192 (2012) (involving a conviction for trafficking by transportation and possession of 29 Percocet — a combination of oxycodone and non-controlled substances — pills); State v. Romero, — N.C. App. —, 729 S.E.2d 731, 2012 WL 3192738, at *1-2 (2012) (unpublished) (involving a conviction for trafficking by possession of 30.5 oxycodone pills). And even more unsettling, as noted by defendants, possession of one bottle of over-the-counter cough syrup containing codeine could be punished as trafficking under this literal application of the statute. This cannot be what the legislature intended.
The majority is also correct that the plain language of the statute allows for the mass of an entire “mixture” to be considered and that this definition could apply to prescription pills or tablets as well. But, this interpretation also leads to disturbing results. Taking total mass into account makes sense in the street drug context: drug dealers often “cut” their product with other substances to increase the number of customers and to thus make a larger profit. This practice was recognized by this Court in State v. Perry. “The mixing and packaging into dosage containers of a controlled substance with other noncontrolled substances indicates an intent to distribute the controlled substance on a large scale.” 316 N.C. 87, 101, 340 S.E.2d 450, 459 (1986). However, that logic does not apply when examining prescription pills. Instead of the drug dealer mixing the substance, it is the pharmaceutical company, with different incentives, that creates the tablet or pill. Therefore, I would suggest that the General Assembly reconsider whether it intends that “mixtures” of illegal street drugs be treated differently from prescription pills for the purposes of subsection 90-95(h), and if so, to consider acting accordingly.
Finally, although the majority cites to a failed attempt to change this language in 2009 as evidence that the legislature has reviewed and approved our courts’ interpretation of the statute, I do not see the failed legislation as providing compelling evidence of that fact. While the majority cites to Young v. Woodall, 343 N.C. 459, 462-63, 471 S.E.2d 357, 359 (1996) for the proposition that we may look to legislative inaction for support of this Court’s decision, this Court has also pronounced that
*447 [ w]e must be leery, however, of inferring legislative approval of appellate court decisions from what is really legislative silence. “Legislative inaction has been called a ‘weak reed upon which to lean’ and a ‘poor beacon to follow’ in construing a statute.” 2A N. Singer, Sutherland Statutory Construction 407 (1984). “[It is] impossible to assert with any degree of assurance that [legislative inaction] represents (1) approval of the status quo, as opposed to (2) inability to agree upon how to alter the status quo, (3) unawareness of the status quo, (4) indifference to the status quo, or even (5) political cowardice.”
DiDonato v. Wortman, 320 N.C. 423, 425, 358 S.E.2d 489, 490 (1987) (last sentence quoting Johnson v. Transp. Agency, Santa Clara Cnty., Cal, 480 U.S. 616, 672, 107 S. Ct. 1442, 1472 (Scalia, J. & Rehnquist, C.J., dissenting)); see also N.C. Dep’t of Corr. v. N.C. Med. Bd., 363 N.C. 189, 202, 675 S.E.2d 641, 650 (2009) (“That a legislature declined to enact a statute with specific language does not indicate the legislature intended the exact opposite.”); Styers v. Phillips, 277 N.C. 460, 472-73, 178 S.E.2d 583, 589-91 (1971) (“[Ordinarily the intent of the legislature is indicated by its actions, and not by its failure to act.”). Though our precedent on this issue appears less than crystal clear, -I find the reasoning in DiDonato more compelling than the reasoning in Young, and more in line with United States Supreme Court precedent. See, e.g., United States v. Craft, 535 U.S. 274, 287, 122 S. Ct. 1414, 1425 (2002) (stating that “[congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction” (alteration in original) (citation and quotation marks omitted)); Schweiker v. Chilicky, 487 U.S. 412, 440, 108 S. Ct. 2460, 2476 (1988) (“Inaction, we have repeatedly stated, is a notoriously poor indication of congressional intent (Brennan, Marshall & Blackmun, J.J., dissenting) (citations omitted)); Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 650, 110 S. Ct. 2668, 2678 (1990) (“But subsequent legislative history is a ‘hazardous basis for inferring the intent of an earlier’ Congress. It is a particularly dangerous ground on which to rest an interpretation of a prior statute when it concerns, as it does here, a proposal that does not become law. Congressional inaction lacks ‘persuasive significance’ because ‘several equally tenable inferences’ may be drawn from such inaction, ‘including the inference that the existing legislation already incorporated the offered change.’ ” (internal citations omitted)). Therefore, I would not accord much weight, if any, to the General Assembly’s failure to ultimately amend N.C.G.S. § 90-95(h)(4).
*448 The illegal sale and use of prescription drugs is one of the most serious problems currently confronting law enforcement. Accordingly, traffickers in this market should be punished severely; however, our current application of N.C.G.S. § 90-95(h)(4) has led, in this case — and in others — to the prosecution and conviction of individuals who do not appear to fall within the intended class targeted by the statute: large-scale professional drug dealers. Instead, small-scale dealers and end users have been swept in by the broad language of the statute. I am confident that this is not what the General Assembly intended in enacting this statute. As such, I respectfully concur in the result only.
Justice JACKSON joins in this concurring opinion.