675 S.E.2d 641 (2009)
NORTH CAROLINA DEPARTMENT OF CORRECTION; Theodis Beck, Secretary of the North Carolina Department of Correction, in his official capacity; and Gerald J. Branker, Warden of Central Prison, in his official capacity
v.
NORTH CAROLINA MEDICAL BOARD.
No. 51PA08.
Supreme Court of North Carolina.
May 1, 2009.
*643 Roy Cooper, Attorney General, by Thomas J. Pitman, Special Deputy Attorney General, and Joseph Finarelli, Assistant Attorney General, for plaintiff-appellees.
D. Todd Brosius and Thomas W. Mansfield, Raleigh, for defendant-appellant.
Nelson Mullins Riley & Scarborough, LLP, by Wallace C. Hollowell, III, Raleigh, for American Medical Association, amicus curiae.
Timothy C. Miller, Dallas, TX, for Federation of State Medical Boards of the U.S., Inc., amicus curiae.
Womble Carlyle Sandridge & Rice, PLLC, by Sarah L. Buthe, Raleigh, for Physicians for Human Rights, amicus curiae.
BRADY, Justice.
In January 2007 the North Carolina Medical Board (Medical Board) issued a Position Statement on physician participation in executions. This statement prohibits physicians licensed to practice medicine in North Carolina, under the threat of disciplinary action, from any participation other than certifying the fact of the execution and simply being present at the time of the execution. Because of this Position Statement, physicians have declined to participate in executions in any manner, which has resulted in a de facto moratorium on executions in North Carolina. To rectify this situation, plaintiffs North Carolina Department of Correction, Theodis Beck, and Marvin Polk[1] brought suit seeking injunctive relief prohibiting the Medical Board from taking any disciplinary action against physicians for participating in an execution and a declaratory judgment delineating the rights and obligations of plaintiffs *644 and the Medical Board with regards to executions.
This case presents four issues: First, whether a justiciable case or controversy exists between plaintiffs and the Medical Board; second, whether any such case or controversy is ripe for decision; third, whether the trial court impermissibly made a finding of fact without accepting evidence from defendant; and fourth, whether the Position Statement is inconsistent with the manifest intent of the General Assembly in enacting N.C.G.S. § 15-190, which requires a physician to be present at all executions. We hold that plaintiffs have standing, that this case is ripe for decision, that the trial court did not make an improper finding of fact, and that the Position Statement is inconsistent with N.C.G.S. § 15-190. Accordingly, we affirm the order of the trial court.

FACTUAL AND PROCEDURAL BACKGROUND

Brown v. Beck
The genesis of the present controversy was a case in the United States District Court for the Eastern District of North Carolina challenging the constitutionality of North Carolina's lethal injection protocol. In Brown v. Beck, a condemned prisoner filed a 42 U.S.C. § 1983 action seeking injunctive relief to allow time to review the protocol and procedures the State intended to employ in his upcoming execution. 2006 WL 3914717 (E.D.N.C. Apr. 7, 2006) (No. 5:06CT3018 H). The plaintiff contended that the protocol and procedures the defendant agents of the Department of Correction intended to use were constitutionally deficient because of (1) their failure to "ensure that the personnel responsible for anesthesia are appropriately trained and qualified," and (2) their lack of "adequate standards for administering injections and monitoring consciousness." Id. at *1. The plaintiff also objected to the defendants' failure "to make adequate efforts to identify and address contingencies that may arise during execution." Id. Judge Malcolm J. Howard conditionally denied the plaintiff's motion for a preliminary injunction, but found that the plaintiff "has raised substantial questions as to whether North Carolina's execution protocol creates an undue risk of excessive pain." Id. at *8. The court found "that the questions raised could be resolved by the presence of medical personnel who are qualified to ensure that Plaintiff is unconscious at the time of his execution," and it ordered defendants to promptly "file with this Court and serve upon Plaintiff a notice setting forth the plans and qualifications of such personnel." Id. On 12 April 2006, the defendants submitted a revised execution protocol requiring the use of additional equipment to monitor the prisoner's level of consciousness and specifying that the equipment would be "observed and its values read by" both a licensed registered nurse and a licensed physician. On 17 April 2006, the court found the plaintiff's objections to the revised protocol to be without merit and denied the injunctive relief sought, stating, inter alia, that the court "is satisfied by the State's plan to use a licensed registered nurse and a licensed physician to monitor the level of plaintiff's consciousness." Brown (Apr. 17, 2006) (Final Order).

The Issuance of the Medical Board's Position Statement
In April 2006 the Medical Board received a complaint alleging that a physician was scheduled to participate in an execution. The Medical Board investigated this complaint and determined it was unfounded. Following other inquiries about the Medical Board's position on executions, the Medical Board issued the following Position Statement[2] in January 2007:
CAPITAL PUNISHMENT
The North Carolina Medical Board takes the position that physician participation in capital punishment is a departure from the ethics of the medical profession within the meaning of N.C. Gen.Stat. § 90-14(a)(6). The North Carolina Medical Board adopts and endorses the provisions of AMA Code of Medical Ethics Opinion 2.06 printed below *645 except to the extent that it is inconsistent with North Carolina state law.
The Board recognizes that N.C. Gen.Stat. § 15-190 requires the presence of "the surgeon or physician of the penitentiary" during the execution of condemned inmates. Therefore, the Board will not discipline licensees for merely being "present" during an execution in conformity with N.C. Gen.Stat. § 15-190. However, any physician who engages in any verbal or physical activity, beyond the requirements of N.C. Gen.Stat. § 15-190, that facilitates the execution may be subject to disciplinary action by this Board.
Relevant Provisions of AMA Code of Medical Ethics Opinion 2.06
An individual's opinion on capital punishment is the personal moral decision of the individual. A physician, as a member of a profession dedicated to preserving life when there is hope of doing so, should not be a participant in a legally authorized execution. Physician participation in execution is defined generally as actions which would fall into one or more of the following categories: (1) an action which would directly cause the death of the condemned; (2) an action which would assist, supervise, or contribute to the ability of another individual to directly cause the death of the condemned; (3) an action which could automatically cause an execution to be carried out on a condemned prisoner.
Physician participation in an execution includes, but is not limited to, the following actions: prescribing or administering tranquilizers and other psychotropic agents and medications that are part of the execution procedure; monitoring vital signs on site or remotely (including monitoring electrocardiograms); attending or observing an execution as a physician; and rendering of technical advice regarding execution.
In the case where the method of execution is lethal injection, the following actions by the physician would also constitute physician participation in execution: selecting injection sites; starting intravenous lines as a port for a lethal injection device; prescribing, preparing, administering, or supervising injection drugs or their doses or types; inspecting, testing, or maintaining lethal injection devices; and consulting with or supervising lethal injection personnel.
The following actions do not constitute physician participation in execution: (1) testifying as to medical history and diagnoses or mental state as they relate to competence to stand trial, testifying as to relevant medical evidence during trial, testifying as to medical aspects of aggravating or mitigating circumstances during the penalty phase of a capital case, or testifying as to medical diagnoses as they relate to the legal assessment of competence for execution; (2) certifying death, provided that the condemned has been declared dead by another person; (3) witnessing an execution in a totally nonprofessional capacity; (4) witnessing an execution at the specific voluntary request of the condemned person, provided that the physician observes the execution in a nonprofessional capacity; and (5) relieving the acute suffering of a condemned person while awaiting execution, including providing tranquilizers at the specific voluntary request of the condemned person to help relieve pain or anxiety in anticipation of the execution.
Official Change in Protocol
On 25 January 2007, a preliminary injunction staying all executions was entered by the Superior Court, Wake County, in a case separate from the case at bar. The Superior Court concluded in its order that the earlier change in protocol made by the Department of Correction and Warden Polk must be submitted to and approved by the Governor and Council of State. Thus, on 6 February 2007, the Department of Correction and Warden Polk presented an updated Execution Protocol to the Governor and Council of State pursuant to N.C.G.S. § 15-188. The submitted Protocol contained the following section on personnel:
The Warden shall ensure that the lethal injection procedure is administered by personnel who are qualified to set up and prepare the injections described above, administer the preinjections, insert the IV catheter, and to perform other tasks required *646 for this procedure in accordance with the requirements of Article 19 [of Chapter 15 of the General Statutes] and this Execution Protocol. Medical doctors, physician assistants, advanced degree nurses, registered nurses, and emergency medical technician-paramedics, who are licensed or certified by their respective licensing boards and organizations, shall be deemed qualified to participate in the execution procedure. As required by Article 19, a licensed medical doctor shall be present at each execution. The doctor shall monitor the essential body functions of the condemned inmate and shall notify the Warden immediately upon his or her determination that the inmate shows signs of undue pain or suffering. The Warden will then stop the execution. The doctor shall also be responsible for certifying the death of the inmate at such time as he or she determines the procedure has been completed as required by N.C.G.S. § 15-192.
That same day, the Governor and Council of State approved the proposed Protocol.
In Warden Polk's second affidavit, filed in conjunction with plaintiff's amended complaint, Warden Polk affirmed:
14. On behalf of Plaintiffs, I have solicited physicians licensed by the State of North Carolina and employed by or contracting with the North Carolina Department of Correction in an effort to locate a licensed physician who would be willing to participate or otherwise be involved in executions of condemned inmates in North Carolina despite the impending threat of disciplinary action by the [Medical] Board for violation of the Position Statement and the ethics of the medical profession.
15. My solicitation efforts have been unsuccessful as all licensed physicians I have contacted, including current employees of the North Carolina Department of Correction, have advised that they refuse to subject themselves to disciplinary action by the [Medical] Board for participating or otherwise being involved in a judicial execution.
16. The potential for disciplinary action against licensed physicians has prevented plaintiffs from locating a licensed physician willing to be present for the execution of any condemned inmate as required by N.C. Gen.Stat. § 15-190. Further, the absence of a licensed physician from an execution by lethal injection would violate N.C. Gen.Stat. § 15-190.
Because plaintiffs believed they could not carry out their statutory responsibility to execute condemned inmates because of the Medical Board's Position Statement, plaintiffs filed suit against the Medical Board, seeking injunctive relief and a declaratory judgment. The Medical Board filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and also argued that plaintiffs lacked standing and that there was no justiciable case or controversy.
Following arguments by the parties, Judge Donald Stephens of the Superior Court, Wake County, made the following declarations of law on 1 October 2007:
7. Logic and common sense would suggest that the requirements in N.C. Gen. Stat. §§ 15-190 and -192,  imposing a specific duty and task upon the surgeon or physician of Central Prison to be "present" for executions and to "certify the fact of the execution"  are indicative of a statutory intent by the General Assembly to require the attendance and professional participation of a physician by reason of that individual's occupation, training and expertise in medicine. The legislature intended that a physician be present to perform medical tasks attendant to an execution for which the physician is uniquely qualified, including: (1) ensuring, to the extent possible, that the condemned inmate is not subjected to unnecessary and excessive pain which could constitute cruel and unusual punishment prohibited by the Eight[h] Amendment to the United States Constitution and Section 27 of the North Carolina Constitution; and (2) examining the inmate at the conclusion of the procedure for the purpose of determining and pronouncing death.
8. The plain language of the Medical Board's Position Statement prohibits any professional conduct by the surgeon or physician to assess and prevent unnecessary or excessive pain experienced by the inmate, including such activities as: (1) *647 monitoring the essential body functions of the inmate; (2) observing the monitoring equipment assessing those body functions; (3) providing professional expertise and medical advice to correctional staff participating in the execution; (4) notifying the Warden or other correctional staff members of any perceived problems with the establishment or maintenance of the intravenous sites or with the preparation and administration of the required chemicals or with the adequacy of the dosage units of those chemicals to be administered to a particular inmate to insured [sic] that the inmate would be rendered unconscious and unlikely to experience pain during the execution process. The physician is prohibited from treating any medical problem or issue that might arise during an execution and from actually examining the inmate for any medical purpose, including determining and pronouncing that death has occurred.
9. By the Medical Board's Position Statement, the Board has declared that the medical activities outlined in paragraph 8 above, whether or not those activities are required by the law and Constitutions of the United States and North Carolina, violated the ethics of the medical profession. The Board's Position Statement prohibits such activities and gives notice that any physician participating in that conduct will be subject to discipline even where the activities are performed in accordance with State law.
The trial court further declared that there was "a ripe and justiciable case and controversy" between plaintiffs and defendant and concluded as a matter of law that:
The Medical Practices Act of 1858, which forms the origin of N.C. Gen.Stat. § 90-2, was not intended to give to the North Carolina Medical Board the authority to prohibit doctors from performing specific statutory tasks enacted by the legislature in other statutes including tasks which are currently embodied in N.C. Gen. Stat. §§ 15-190 and -192. In creating those tasks in 1909, the legislature clearly intended that a physician attend and provide professional medical assessment, assistance and oversight in every judicial execution compelled by law upon inmates convicted and sentenced to death by jury verdict in the superior courts of this State.
Although the current effort by the Medical Board to prohibit physician participation in execut[ions] may well be viewed as humane and noble, such a decision rests entirely with representatives elected by the citizens of this State, the North Carolina General Assembly. As of this date, the legislature has taken no such action.
Therefore, the trial court allowed plaintiffs' requests for preliminary and injunctive relief and declared that executions are not medical procedures and thus are outside the scope of Chapters 90 and 131E of the North Carolina General Statutes.
The Medical Board gave notice of appeal from the trial court's order, but on 6 February 2008, plaintiffs sought review by this Court prior to the determination of the matter by the Court of Appeals. The Medical Board filed a petition for discretionary review as to additional issues on 18 February 2008. We allowed plaintiffs' petition on 10 April 2008 and the Medical Board's petition on 29 April 2008. We now affirm the trial court's decision.

ANALYSIS

Existence of a Case or Controversy
We first address defendant's arguments that the trial court erred in determining that a justiciable case or controversy exists.
The Superior Court has jurisdiction to render a declaratory judgment only when the pleadings and evidence disclose the existence of a genuine controversy between the parties to the action, arising out of conflicting contentions as to their respective legal rights and liabilities under a deed, will, contract, statute, ordinance, or franchise.
Nationwide Mut. Ins. Co. v. Roberts, 261 N.C. 285, 287, 134 S.E.2d 654, 656-57 (1964) (citations omitted). Thus, we must determine whether there exists a genuine controversy between plaintiffs and defendant "arising out of conflicting contentions as to their *648 respective legal rights and liabilities under a. . . statute." Id.
Section 15-188 provides in pertinent part:
The superintendent of the State penitentiary shall also cause to be provided, in conformity with this Article and approved by the Governor and Council of State, the necessary appliances for the infliction of the punishment of death and qualified personnel to set up and prepare the injection, administer the preinjections, insert the IV catheter, and to perform other tasks required for this procedure in accordance with the requirements of [Article 19 of Chapter 15 of the General Statutes].
N.C.G.S. § 15-188 (2007). Moreover, our General Statutes provide that:
The execution shall be under the general supervision and control of the warden of the penitentiary, who shall from time to time, in writing, name and designate the guard or guards or other reliable person or persons who shall cause the person, convict or felon against whom the death sentence has been pronounced to be executed as provided by this Article and all amendments thereto. At such execution there shall be present the warden or deputy warden . . . and the surgeon or physician of the penitentiary.
Id. § 15-190 (2007). Thus, the General Assembly has mandated that the Warden of Central Prison ensure the execution of inmates condemned to death by requiring the Warden to "cause to be provided . . . qualified personnel . . . to perform other tasks required for this procedure." Id. § 15-188. The General Assembly has also required that the "surgeon or physician of the penitentiary" be "present" when the death sentence is executed. Id. § 15-190.
Chapter 90 of our General Statutes places responsibility on defendant "to regulate the practice of medicine and surgery for the benefit and protection of the people of North Carolina," id. § 90-2(a) (2007), which includes the authority to discipline physicians for failure to adhere to "the ethics of the medical profession," id. § 90-14(a)(6) (2007).
Plaintiffs, in attempting to fulfill their statutory duty while also complying with the constraints of the North Carolina and United States Constitutions, produced a protocol envisioning physician participation in administering the death penalty, which was presented to and approved by the Governor and the Council of State. The Medical Board, seeking to fulfill its statutory duty to promote the ethical practice of medicine, developed a Position Statement which prohibits physician participation in an execution. Thus, the actions of two governmental entities, both seeking to fulfill their statutory duties, are in irreconcilable conflict. Plaintiffs cannot carry out their statutory duty to execute condemned inmates under the Execution Protocol without subjecting a physician to discipline by the Medical Board. As such, there is a genuine controversy between plaintiffs and defendant "arising out of conflicting contentions as to their respective legal rights and liabilities under a . . . statute." Roberts, 261 N.C. at 287, 134 S.E.2d at 656-57. We agree with the trial court's declaration of law that plaintiffs have standing to litigate this issue. Accordingly, defendant's assignments of error are overruled.

Ripeness
Next, defendant argues that any case and controversy between the parties is not yet ripe for decision because (1) there is pending litigation challenging the procedures used by the Council of State in approving the current protocol and (2) defendant "has not yet had before it a matter involving active participation by a physician in a judicial execution." We disagree. The existence of pending litigation involving a matter ancillary to the case at bar does not render the issue presented here unripe. There is no standing court order that would otherwise prohibit plaintiffs from performing their statutory duty to conduct executions. Instead, the only issue currently preventing plaintiffs from fulfilling their statutory duties is their inability to find a physician willing to participate in an execution in contravention of defendant's Position Statement. Simply put, the existence of litigation at a lower level that may later affect plaintiff's ability to fulfill their statutory duties does not render the instant issue of statutory interpretation nonjusticiable. Moreover, this issue is not unripe simply because defendant has not yet *649 disciplined a medical doctor for participating in an execution. The determinative point is that plaintiffs are hindered in their ability to perform their statutory duties because they are unable to find a physician willing to subject himself or herself to discipline for participating in an execution. Accordingly, it is irrelevant that a specific case addressing such conduct has not yet come before the Medical Board. We conclude that this matter is ripe for judicial review, and defendant's assignments of error are thus overruled.

The Trial Court's Statement on Physician Participation
Defendant argues that the trial court erroneously decided a question of fact or a mixed question of law and fact when the trial judge stated during the hearing: "I believe that historically whether required by statute or not, physicians have taken an active role in this procedure. I can't believe in 1907 that the physician required (inaudible) to observe and be present at an execution did not examine the deceased and pronounce the deceased dead." Defendant asserts that the trial court lacked any evidence to support its statement and that the court erred in refusing defendant's request to offer evidence on the role physicians have historically played in executions. Defendant's argument is without merit. First, the trial court's order evinces nothing that demonstrates or even intimates that the trial court based its decision, in whole or in part, upon whether physicians took an active role in executions before passage of the 1909 statute. Moreover, the trial court's statement was not designated as a finding of fact, nor was it included in the trial court's declarations of law or conclusions of law in its order. Therefore, the statement is not essential to the trial court's decision and can be considered surplusage. Finally, our conclusion is consistent with the mandate to the trial court that it "find the facts specially and state separately its conclusion of law thereon" when the action is "tried upon the facts without a jury." N.C.G.S. § 1A-1, Rule 52(a) (2007). Here, the trial court's order stated no findings of fact, and its decision did not determine or rest upon any disputed facts, but solely upon declarations and conclusions of law. Defendant's assignments of error are overruled.

The Validity of the Position Statement
Having concluded that a genuine case or controversy exists and that this matter is ripe for decision, we turn to the overriding issue in the instant casethe meaning of the word "present" in N.C.G.S. § 15-190.
When the language of a statute is clear and without ambiguity, it is the duty of this Court to give effect to the plain meaning of the statute, and judicial construction of legislative intent is not required. However, when the language of a statute is ambiguous, this Court will determine the purpose of the statute and the intent of the legislature in its enactment.
Diaz v. Div. of Soc. Servs., 360 N.C. 384, 387, 628 S.E.2d 1, 3 (2006) (citing Burgess v. Your House of Raleigh, Inc., 326 N.C. 205, 209, 388 S.E.2d 134, 136 (1990) and Coastal Ready-Mix Concrete Co. v. Bd. of Comm'rs, 299 N.C. 620, 629, 265 S.E.2d 379, 385 (1980) ("The best indicia of that intent are the language of the statute or ordinance, the spirit of the act and what the act seeks to accomplish.")). Because the actual words of the legislature are the clearest manifestation of its intent, we give every word of the statute effect, presuming that the legislature carefully chose each word used. See Rhyne v. K-Mart Corp., 358 N.C. 160, 188, 594 S.E.2d 1, 20 (2004) (stating that "this Court does not read segments of a statute in isolation").
Applying these long-standing rules of statutory construction, we determine that the statutes at issue are clear and unambiguous. Therefore, there is no need for us to resort to other rules of statutory construction, but simply to apply the statutes as written to the case at bar. Diaz, 360 N.C. at 387, 628 S.E.2d at 3.
In support of its argument that the General Assembly never intended a physician to actively participate in an execution, defendant asserts that we should consider the legislative history of Sections 15-190 and 15-192 and the two-decade-long interpretation of the statute by plaintiffs. This we decline to do. Initially, we note that defendant's recitation of the legislative history of Sections 15-190 and 15-192 relies heavily upon the modification of the mode of execution in North Carolina from asphyxiation to lethal injection *650 in 1983. Specifically, defendant relies on the decision of the 1983 Senate Judiciary Committee to not include a provision requiring that a physician administer the ultrashort-acting barbiturate and chemical paralytic agent that cause the condemned inmate's death. However, this decision of a legislative committee consisting of a small percentage of a single house of our bicameral legislature seventy-three years after the enactment of the statutory language at issue carries no weight in our determination of the intent of the enacting legislature.
First, this Court has previously recognized the rule "that ordinarily the intent of the legislature is indicated by its actions, and not by its failure to act." Styers v. Phillips, 277 N.C. 460, 472-73, 178 S.E.2d 583, 589-91 (1971) ("`Courts can find the intent of the legislature only in the acts which are in fact passed, and not in those which are never voted upon in Congress, but which are simply proposed in committee.'" (quoting United States v. Allen, 179 F. 13, 19 (8th Cir.1910), aff'd as modified on other grounds by Goat v. United States, 224 U.S. 458, 32 S.Ct. 544, 56 L.Ed. 841 (1912), and by Deming Inv. Co. v. United States, 224 U.S. 471, 32 S.Ct. 549, 56 L.Ed. 847 (1912))). That a legislature declined to enact a statute with specific language does not indicate the legislature intended the exact opposite. Id. at 472, 178 S.E.2d at 589 (declining "`to attribute any such attitude to the Legislature'" and noting that a party's argument as to why a bill failed to pass "`can be nothing more than conjecture'" and "`[m]any other reasons for legislative inaction readily suggest themselves'" (quoting Moore v. Bd. of Chosen Freeholders, 76 N.J.Super. 396, 404, 184 A.2d 748, 752 (App.Div.), modified on other grounds, 39 N.J. 26, 186 A.2d 676 (1962))). Finally, "[i]n determining legislative intent, this Court does not look to the record of the internal deliberations of committees of the legislature considering proposed legislation." Elec. Supply Co. of Durham v. Swain Elec. Co., 328 N.C. 651, 657, 403 S.E.2d 291, 295 (1991). For all of these reasons, the committee's decision to not present the bill with language requiring that a physician administer the lethal agents bears no weight on whether the General Assembly foreclosed any physician participation. Moreover, plaintiffs' prior interpretation of the statute at issue is irrelevant in our determination of the intent of the legislation as derived from the plain language of the statute.
Additionally, defendant asserts that the history surrounding the 1909 enactment of N.C.G.S. § 15-190 supports its position that the legislature did not envision physician participation in any way during the condemned inmate's execution. Specifically, defendant argues that in 1909 the method of execution was changed from hanging by the sheriff in the county of conviction to electrocution at Central Prison, and thus, the physician was only required to be present to certify the death of the condemned inmate. See N.C.G.S. § 15-192 (2007) (which has remained unchanged since it was enacted in 1909 and reads in pertinent part: "The Warden, together with the surgeon or physician of the penitentiary, shall certify the fact of the execution of the condemned prisoner.. . ."). Defendant argues that it would have been impossible for a physician to participate in an execution by using monitoring equipment in 1909 to measure the progress of, and any possible undue pain and suffering caused by, the electrocution. We observe that to the contrary, it would not be necessary for a physician to be present at the execution itself to certify the death of the condemned inmate. The deaths of our citizenry are certified all across this State on a daily basis, and rarely, if ever, is the professional certifying death present at the time the death occurs. Moreover, the absence of monitoring equipment in 1909 did not diminish a physician's special skill and knowledge of the human body and his or her ability to recognize when a human being is suffering an inordinate amount of pain. To accept defendant's interpretation of the 1909 statute would require us to determine that the 1909 legislature merely intended that a licensed medical doctor be present only as an uninvolved onlooker[3] during an inmate's execution. Common sense dictates otherwise.
Section 15-190 requires a physician to be present at the execution of a condemned *651 inmate. The General Assembly did not include such a requirement simply to have a "professional" present at the time of the execution without that individual supplying some sort of professional assistance. The warden or his designee is required to be present to perform his duty to carry out the execution. The condemned inmate's legal counsel may be present, certainly in his or her professional capacity. A clergy member may be present, certainly in his or her professional capacity. Two of the three learned professions (attorneys and clergy) are allowed to attend an execution and are presumably permitted to act in a manner commensurate with the duties of their profession, but, according to defendant, the third (physician) is required simply to be present and not act in any professional capacity. See N.C.G.S. § 15-190; Patronelli v. Patronelli, 360 N.C. 628, 630, 636 S.E.2d 559, 561 (detailing the three learned professions). To assert that the physician is to merely occupy space in a non-professional capacity is simply illogical and renders unintelligible the requirement that "the surgeon or physician of the penitentiary" be present. N.C.G.S. § 15-190.
Thus, the General Assembly has specifically envisioned some sort of medical participation in the execution process, and defendant's Position Statement runs afoul of N.C.G.S. § 15-190 by completely prohibiting physician participation in executions. While defendant would retain disciplinary power over a licensed medical doctor who participates in an execution, see N.C.G.S. § 90-14, defendant may not discipline or threaten discipline against its licensees solely for participating in the execution alone. To allow defendant to discipline its licensees for mere participation would elevate the created Medical Board over the creator General Assembly.
Moreover, the language of the Protocol itself, as submitted by the Warden and approved by the Governor and Council of State does not overstep the statutory authority of those officials to determine and approve the exact means of execution. Exceptional care was taken when drafting the Protocol to ensure that it would not cause a physician to violate the Hippocratic Oath. Under the Protocol, the physician is not required to administer the lethal agents, nor is the physician required to do anything other than "monitor the essential body functions of the condemned inmate and [ ] notify the Warden immediately upon his or her determination that the inmate shows signs of undue pain or suffering." The physician is given authority in the Protocol to ensure that no undue harm is inflicted on the condemned inmate: if the physician determines there is undue pain or suffering, "[t]he Warden will then stop the execution." Certainly, the Protocol's requirement that a physician help prevent "undue pain or suffering" is consistent with the physician's oath to "do no harm." The Warden is well within his authority to require such monitoring, and defendant is without power to prevent the Warden from doing so. Defendant's assignments of error are overruled.

CONCLUSION
Accordingly, we hold that N.C.G.S. § 15-190, by its plain language, envisions physician participation in executions in some professional capacity. Defendant's Position Statement exceeds its authority under Chapter 90 of the North Carolina General Statutes because the Statement directly contravenes the specific requirement of physician presence found in N.C.G.S. § 15-190. Because plaintiffs have standing, a genuine controversy exists, the issue is ripe for decision, and the trial court did not impermissibly decide questions of fact or fail to allow additional presentation of evidence; and because the Position Statement is an invalid exercise of defendant's statutory powers, we affirm the decision of the trial court.
AFFIRMED.
Justice HUDSON dissenting.
Because I believe that changes in statutory language and definitions are fundamentally tasks for the legislature, not the courts, I respectfully dissent. Here, the General Assembly has given defendant, the North Carolina Medical Board, broad authority to discipline physicians, and in my view, the nonbinding Position Statement at issue comports with that authority. The Statement is also entirely consistent with the requirements *652 of N.C.G.S. §§ 15-190 and -192, in that it indicates that a physician will not be disciplined for "merely being `present' during an execution," as required by the plain language of those statutes. Nevertheless, the majority's holding here oversteps our role by fashioning a definition of "present" that would create a conflict between two governmental entities where there currently is none. I would instead find that no genuine case or controversy appropriate for the courts exists between these parties.
The General Assembly granted the following authority to defendant:
(a) The Board shall have the power to place on probation with or without conditions, impose limitations and conditions on, publicly reprimand, assess monetary redress, issue public letters of concern, mandate free medical services, require satisfactory completion of treatment programs or remedial or educational training, fine, deny, annul, suspend, or revoke a license, or other authority to practice medicine in this State, issued by the Board to any person who has been found by the Board to have committed any of the following acts or conduct, or for any of the following reasons:
. . . .
(6) Unprofessional conduct, including, but not limited to, departure from, or the failure to conform to, the standards of acceptable and prevailing medical practice, or the ethics of the medical profession, irrespective of whether or not a patient is injured thereby, or the committing of any act contrary to honesty, justice, or good morals, whether the same is committed in the course of the physician's practice or otherwise, and whether committed within or without North Carolina.

N.C.G.S. § 90-14(a)(6) (2007) (emphases added). This sweeping authority, by its plain language, permits defendant to discipline licensees even for actions not committed during the course of medical practice and for matters occurring outside of our state. This statute, which has been a part of North Carolina law in one form or another since the Medical Practices Act of 1858, reflects our legislature's intention to confer on defendant broad powers to regulate its own profession. Nevertheless, in a holding that finds the Position Statement in question to be "an invalid exercise of defendant's statutory powers," the majority fails to recognize or even discuss the comprehensive nature of the "statutory powers" granted to defendant by the General Assembly.
In their amended complaint, plaintiffs allege that because of defendant's Position Statement, physicians are "compelled . . . to choose between jeopardizing their employment. . . or subjecting themselves to potential disciplinary action by Defendant." Plaintiffs contend that, as a direct result of this fear of discipline, plaintiffs have been unable to locate a physician "willing to participate or otherwise be involved in a judicial execution," leading to their being "unable to carry out those duties the laws of North Carolina empower and require [them] to complete." Plaintiffs then asked the trial court (1) to enjoin defendant from disciplining any licensed physicians for involvement in executions carried out by plaintiffs; (2) to "declare the rights and obligations" of the parties; and (3) to declare that "a judicial execution is not a medical procedure" and thus "outside the authority of Defendant [under N.C.G.S. § 14-90] . . . to oversee or regulate, despite the involvement of a licensed physician." The trial court entered an order granting all three of these requests.
As recounted by the majority and by defendant in its brief to this Court, "[t]he genesis of the present controversy" was the order entered in Brown v. Beck, 2006 WL 3914717 (E.D.N.C. Apr. 7, 2006) (No. 5:06CT3018 H), in which a federal district court judge compelled these plaintiffs to file "a notice setting forth the plans and qualifications of such [medical] personnel" "who are qualified to ensure that [a condemned prisoner] is unconscious at the time of his execution." Id., at *8. The revised protocol submitted by these plaintiffs included a provision that a condemned prisoner's level of consciousness would be monitored by a "licensed medical doctor."
Following entry of the final order in Brown, and in direct response to "several inquiries from physicians . . . seeking guidance," *653 defendant "[r]ealiz[ed] that the proper role of physicians in executions would likely be a recurrent issue" and "determined that it would be appropriate to consider issuing a Position Statement regarding the ethical implications and potential disciplinary consequences" of such a role. Beginning in the latter half of 2006, defendant undertook to draft and issue this Position Statement and ultimately adopted it in January 2007, pursuant to its statutory authority.
According to defendant, its Position Statement "attempted to harmonize the Medical Board's obligation to enforce the ethics of the medical profession with the statutory requirements of sections 15-190 and -192 . . . that a physician be `present' at a judicial execution and certify the execution." Although the majority erroneously characterizes the Position Statement as "prohibit[ing] physicians licensed to practice medicine in North Carolina, under the threat of disciplinary action, from any participation" in an execution, it does not. In fact, the nonbinding, interpretive Statement provides only that "any physician who engages in any verbal or physical activity, beyond the requirements of N.C. Gen.Stat. § 15-190, that facilitates the execution may be subject to disciplinary action by this Board." (Emphasis added.) The statement prohibits no conduct, but merely acknowledges the possibility that defendant could discipline a physician who acts beyond the statutory requirement of being "present," and provides defendant's guidance as to what might constitute participation beyond that statutory requirement.
Moreover, the Statement explicitly provides that the Board "will not discipline licensees for merely being `present' during an execution in conformity with N.C. Gen.Stat. § 15-190." The portion of the Statement defining "physician participation" in executions was adopted from an American Medical Association's (AMA) Code of Medical Ethics opinion "except to the extent that it is inconsistent with North Carolina state law," thereby ensuring that a licensed physician will not run afoul of the Position Statement if her "participation" falls within statutory guidelines set forth by our legislature. Indeed, I believe defendant succeeded in walking the fine line between its statutory mandate to "regulate the practice of medicine," N.C.G.S. § 90-2(a) (2007), including disciplining licensed physicians for failing to adhere to "the ethics of the medical profession," id. § 90-14(a)(6), and the statutory requirement that a physician be "present" at all executions, id. § 15-190 (2007).
Contrary to plaintiffs' contentions and the majority's analysis, the plain language of defendant's Position Statement is consistent with both the broad grant of authority outlined in N.C.G.S. § 90-14(a)(6) and the specific requirement of being "present" in N.C.G.S. § 15-190. In fact, it is the majority's attempts to discern the legislature's intent and meaning by the word "present," and defendant's use of the word "participation," that create a conflict between the statute and the Position Statement. I note as well that plaintiffs, when arguing before the trial court in this case, likewise averred that defendant's Position Statement "changes nothing. The doctor can still be present. He can still sign the death certificate."
It was only when plaintiffs sought to allay the Eighth Amendment concerns of the federal judge in the Eastern District of North Carolina, by assuring him that the condemned prisoner would be unconscious during the administration of lethal drugs, that plaintiffs promised the more active participation ("monitoring") by physicians in executions. That representation  again, by plaintiffs, not defendantgave rise to North Carolina physicians' uncertainty as to their proper role in executions and defendant's corresponding need to issue a nonbinding, interpretive Position Statement that reiterated the statutory requirement of being "present" but cautioned that further actions should be limited by physicians' ethical responsibilities as medical professionals.
This case was brought under the Uniform Declaratory Judgment Act, which gives courts the power to "determine[ ] any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise" in which a party is "interested" or "affected." N.C.G.S. § 1-254 (2007). We have previously held that before our courts acquire jurisdiction under the Act a "genuine controversy between the parties" must exist. Nationwide Mut. Ins. Co. v. Roberts, 261 *654 N.C. 285, 287, 134 S.E.2d 654, 656 (1964) (citations omitted). As noted by Justice Ervin:
There is much misunderstanding as to the object and scope of [the Uniform Declaratory Judgment Act]. Despite some notions to the contrary, it does not undertake to convert judicial tribunals into counsellors and impose upon them the duty of giving advisory opinions to any parties who may come into court and ask for either academic enlightenment or practical guidance concerning their legal affairs. This observation may be stated in the vernacular in this wise: The Uniform Declaratory Judgment Act does not license litigants to fish in judicial ponds for legal advice.
Lide v. Mears, 231 N.C. 111, 117, 56 S.E.2d 404, 409 (1949) (internal citations omitted).
In the context of a challenge to the constitutionality of a city ordinance, this Court noted:
"The validity or invalidity of a statute in whole or in part, is to be determined in respect of its adverse impact upon personal or property rights in a specific factual situation. . . ."
Our Uniform Declaratory Judgment Act does not authorize the adjudication of mere abstract or theoretical questions. Neither was this act intended to require the Court to give advisory opinions when no genuine controversy presently exists between the parties.
Angell v. City of Raleigh, 267 N.C. 387, 391-92, 148 S.E.2d 233, 236 (1966) (emphasis added) (citations omitted). In Angell, we found no such "genuine justiciable controversy" between the parties because the City of Raleigh had "issued no license pursuant to the provisions of the ordinance alleged to be unconstitutional" at the time of the lawsuit. Id. at 392, 148 S.E.2d at 236. This Court has also held:
Although it is not necessary that one party have an actual right of action against another to satisfy the jurisdictional requirement of an actual controversy, it is necessary that litigation appear unavoidable. Mere apprehension or the mere threat of an action or a suit is not enough.

Gaston Bd. of Realtors, Inc. v. Harrison, 311 N.C. 230, 234, 316 S.E.2d 59, 61-62 (1984) (emphasis added) (citations omitted).
Plaintiffs essentially ask the courts to redefine "present," as used in N.C.G.S. § 15-190, to include "participation" as used in defendant's Position Statement, in order to create a controversy entitling them to a declaratory judgment. Such "bootstrapping" may not generally provide the basis for declaratory judgment. See Griffin v. Fraser, 39 N.C.App. 582, 587, 251 S.E.2d 650, 654 (1979) (holding that a complaint seeking a ruling creating a new interpretation of the Internal Revenue Code that would then create a genuine controversy between the parties "[did] not suffice for the jurisdictional prerequisites of a declaratory judgment action"). Instead, the genuine controversy must appear from the complaint and the record. See, e.g., Hubbard v. Josey, 267 N.C. 651, 652, 148 S.E.2d 638, 639 (1966) (per curiam) ("The test of the sufficiency of a complaint in a declaratory judgment proceeding is not whether the complaint shows that the plaintiff is entitled to the declaration of rights in accordance with his theory, but whether he is entitled to a declaration of rights at all, so that even if the plaintiff is on the wrong side of the controversy, if he states the existence of a controversy which should be settled, he states a cause of suit for a declaratory judgment." (quotation and citation omitted)). To the extent there is a controversy here, it was created by plaintiffs when they included in the 2007 Execution Protocol the requirement that a licensed physician monitor the consciousness of the condemned inmate.
Further, it is far from clear how enjoining defendant from disciplining physicians will achieve the result sought by plaintiffs, namely, the resumption of executions. The court order below neither requires that physicians be involved at executions nor that executions proceed. While the majority is certainly correct in its assertion that the parties have "conflicting contentions as to their respective legal rights and liabilities under a . . . statute," Roberts, 261 N.C. at 287, 134 S.E.2d at 656-57, the controversy concerns primarily whether defendant's authority to discipline physicians for their conduct includes their participation in executions. *655 Until evidence shows that a physician is actually facing discipline, or refuses to be present at an execution solely because of fears of discipline, preventing defendant from disciplining physicians will not necessarily result in a physician serving at an execution, in light of the AMA Code of Medical Ethics. Thus, plaintiffs fail to show that the declaratory judgment they seek can redress their alleged injury. See, e.g., Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556, 569 (1984) (holding that, to establish standing, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." (citation omitted)).
In addition, unless and until litigation related to the 2007 Execution Protocol has ended, we are unable to determine with any accuracy what precise role is required of a physician in an execution in North Carolina. More significantly, we cannot know if there is a conflict between that role and the provisions of defendant's Position Statement. The majority's holding here, or any attempt by this Court to interpret N.C.G.S. § 15-190 and the word "present," has the effect of redefiningand essentially dictatingthat role, a task that is better left to the legislature. The General Assembly granted defendant broad authority to regulate the medical profession, and may limit that authority, should it so desire, to exclude participation in executions. Indeed, our legislature has recognized its responsibility in this regard, as bills are currently pending in both the House and Senate that would remove executions from defendant's authority and prohibit defendant from taking any disciplinary action against a licensed physician who provides professional assistance at such an execution. See S. 161, 149th Gen. Assem., 2009 Sess. (N.C. 2009) ("Execution/Physician Assistance Authorized"); H. 784, 149th Gen. Assem., 2009 Sess. (N.C. 2009) ("Execution/Physician Assistance Authorized"). It is not for this Court to do so, nor is it a proper application of the Uniform Declaratory Judgment Act and the courts' power to enjoin.
For this Court to issue a ruling now in this matter would run afoul of the prohibition against advisory opinions and would lead instead to recklessly "entangling [our]selves in abstract disagreements over administrative policies." Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 807, 123 S.Ct. 2026, 155 L.Ed.2d 1017, 1024 (2003) (citations omitted). Rather, we should seek to "protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Id. at 807-08, 123 S.Ct. at 2030, 155 L.Ed.2d at 1024 (citations omitted). As "ripeness is peculiarly a question of timing," Reg'l Rail Reorg. Act Cases, 419 U.S. 102, 140, 95 S.Ct. 335, 42 L.Ed.2d 320, 351 (1974), perhaps we will be presented with these issues again at a future date. For example, a proper court challenge to defendant's Position Statement might be brought by a North Carolina licensed physician who is present at an upcoming execution and receives notice of disciplinary action for his "participation," whatever that entails. Such a scenario would provide us with the concrete facts necessary to determine whether the application of defendant's Position Statement, pursuant to its statutory authority under section 90-14(a)(6), runs afoul of the General Assembly's specific provision in section 15-190 for the presence of a physician at executions. Unlike the majority's holding here, we would not be fashioning our own definitions in the absence of any evidence as to what "participation" has been, essentially allowing plaintiffs to "`put [a purely advisory opinion] on ice to be used if and when occasion might arise.'"[1]Harrison, 311 N.C. at 234, 316 S.E.2d at 62 (citation omitted).
The majority's analysis of the statutes in question illustrates the hazards we risk by *656 engaging in such speculation. While I agree with the majority's statement, "[t]hat a legislature declined to enact a statute with specific language does not indicate the legislature intended the exact opposite," surely it must also be the case that the failure to enact a provision must be taken as an indication that the legislature did, in fact, intend not to have the effect of the specific language it rejected. We know that our General Assembly refused to require a physician to administer the drugs involved in executions, yet the majority's holding here today would ignore that explicit rejection as immaterial to the question of "medical participation." Instead, it would graft upon the word "present" some professional responsibilities, despite the legislature's failure to refer to "physicians" at all in the detailed language of N.C.G.S. § 15-188 concerning how lethal injections should be administered. As these matters of wording are the result of legislative action, they are best left to the General Assembly to clarify.
Again, however, I emphasize that defendant's nonbinding, interpretive Position Statement, and its provision that physicians "may be subject to disciplinary action" for activities beyond the requirements of N.C.G.S. § 15-190, are not inconsistent with either the plain language of N.C.G.S. § 15-190 or the broad authority granted by N.C.G.S. § 90-14(a)(6). That issuenot the meaning of the word "present," nor that of "participation"is the primary question before this Court, contrary to the majority's interpretation of N.C.G.S. § 15-190.
Plaintiffs' complaint specifically sought a declaration "as to whether a judicial execution is not a medical procedure and thus outside both the scope of Chapters 90 and 131E of the North Carolina General Statutes and the authority of Defendant . . . to oversee or regulate, despite the involvement of a licensed physician." Defendant's brief here asserts error in the trial court's finding, denominated as a conclusion and made without benefit of any evidence, that an execution is not a medical event or procedure. While the trial court appears to have viewed this conclusion as fundamental to its holding that the Statement "is an invalid exercise of defendant's statutory powers," I disagree. The plain language of Section 90-14(a)(6) does not limit defendant's disciplinary authority to "medical procedures"; in fact, it specifically provides the opposite, that defendant may discipline licensees for unprofessional conduct whether "committed in the course of the physician's practice or otherwise." N.C.G.S. § 90-14(a)(6) (emphasis added). I would hold that the Position Statement is a valid exercise of defendant's statutory authority. Any change in that authoritywhich is the practical effect of the majority opinionis a matter for the General Assembly which granted it, not for the courts.
I believe defendant has carefully attempted to carry out its duties under N.C.G.S. § 90-14(a)(6) and has done so in a manner consistent with N.C.G.S. §§ 15-190 and -192. By issuing its Position Statement, defendant has neither prevented plaintiffs from conducting an execution nor prohibited a physician from being present ator even participating insuch an execution. Reconciling these statutes and the Position Statement, an execution could proceed if the Protocol allows and plaintiffs locate a physician willing to be "present," or to "participate" and risk discipline. If plaintiffs desire the General Assembly to limit the authority it granted to defendant under N.C.G.S. § 90-14(a)(6), they must ask the legislature, not the courts, to do so. Indeed, the central "fact" to the injury alleged by plaintiffs is that defendant, in adopting the Position Statement, "unilaterally acted to alter public policy to the exclusion of the General Assembly, and bypassed the courts." Thus, plaintiffs in their own pleading acknowledge the legislative nature of their concern.
Because I conclude that this matter is properly for the General Assembly and does not present a justiciable controversy for declaratory judgment, I would reverse the trial court's order and remand for dismissal of this lawsuit. Thus, I respectfully dissent.
Chief Justice PARKER and Justice TIMMONS-GOODSON join in this dissenting opinion.
NOTES
[1] At the time this action was commenced, Theodis Beck was the Secretary of the North Carolina Department of Correction and brought suit in his official capacity. Alvin W. Keller, Jr. is the current Secretary of the North Carolina Department of Correction. Additionally, Marvin Polk was Warden of Central Prison at the time of suit. The current Warden of Central Prison is plaintiff Gerald J. Branker, who was substituted as a party for former Warden Polk on 24 July 2007.
[2] The Position Statement, according to defendant, is a "non-binding interpretive statement that merely warns that a physician actively participating in [a] judicial execution `may be subject to disciplinary action' by the Medical Board."
[3] Or, as stated during oral arguments, "a potted plant."
[1] The lack of evidence in the record before us on several critical questions also shows why this matter is not yet ripe for judicial review. No evidence was allowed to show what "participation" has entailed for the last one hundred years. Nor do we have any showing, beyond plaintiffs' hearsay assertions, that the non-binding, interpretive Position Statement is the sole reason that licensed physicians in North Carolina have declined to be present at executions, rather than because of their own individual opposition to the death penalty, scheduling conflicts, discomfort with the way their role has been defined in the revised 2007 Execution Protocol, or some other reason. "It is not our practice to decide causes where essential facts wander elusively in the realm of surmise." Boswell v. Boswell, 241 N.C. 515, 519, 85 S.E.2d 899, 902 (1955).